# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Northern Division)

|  |  |
|---|---|
| DAROLD HARRIS, Derivatively on Behalf of Nominal Defendant MUNICIPAL MORTGAGE & EQUITY, LLC, | C.A. No. _____ |
| 10145 Old M-78 Haslett, Michigan 48840 (Ingham County) | |
| -and- | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| JAMES KAZOL, Derivatively on Behalf of Nominal Defendant MUNICIPAL MORTGAGE & EQUITY, LLC, | |
| 6350 Denise Drive N. Ridgeville, Ohio 44039 (Lorain County) | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| vs. | |
| MARK K JOSEPH, MICHAEL L. FALCONE, RICHARD O. BERNDT, CHARLES C. BAUM, EDDIE C. BROWN, ROBERT S. HILLMAN, BARBARA B. LUCAS, DOUGLAS A. MCGREGOR, ARTHUR S. MEHLMAN, EARL W. COLE, DAVID KAY, STEPHEN GOLDBERG, MELANIE M. LUNDQUIST, WILLIAM S. HARRISON, CHARLES M. PINCKNEY and FRED N. PRATT, JR., | |
| c/o Municipal Mortgage & Equity, LLC 621 East Pratt St., Suite 300 Baltimore, Maryland 21202 (Baltimore City) | |
| Defendants, | |
| -and- | |
| MUNICIPAL MORTGAGE & EQUITY, LLC 621 East Pratt St., Suite 300 Baltimore, Maryland 21202 (Baltimore City) | |

---

Serve on:                                          )
The Corporation Trust, Inc., Resident Agent        )
300 E. Lombard St.                                 )
Baltimore, Maryland 21202                          )
                                                   )
                                                   )
                                Nominal Defendant. )

---

## NATURE OF THE ACTION

1.      This is a shareholder's derivative action brought for the benefit of nominal

defendant Municipal Mortgage & Equity, LLC ("MuniMae" or the "Company") against certain

members of its Board of Directors (the "Board") and certain executive officers seeking to

remedy defendants' breaches of fiduciary duties.

2.      The Individual Defendants (defined herein) breached their fiduciary duties by,

among other things, utterly failing to implement adequate internal controls and procedures

relating to financial accounting and disclosures, which led to a sustained and systematic failure

by the Company to properly account for a myriad of issues, thereby necessitating a massive

restatement.   Considering MuniMae's highly complicated business model,[1] which generates

income through a variety of leveraged transactions, the Individual Defendants knew that the bare

---

[1] According to the Company's public filings, MuniMae operates through four business segments:

• Through  our debt segment we (1) invest in tax exempt bonds and bond securitizations; (2) make taxable construction, supplemental and permanent loans; (3) provide loan servicing; and (4) originate loans that are ultimately sold to government sponsored enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Government National Mortgage Association ("Ginnie Mae") or insured by agencies such as the Federal Housing Administration ("FHA") and the U.S. Department of Housing and Urban Development ("HUD").

 • Through our tax credit equity segment we provide tax credit equity syndication and asset management services.

 • Through our structured finance segment we invest in other real estate-related securities, including equity investments in real estate operating partnerships, tax exempt and taxable bonds, bond securitizations and taxable loans.

 • Through our fund management segment we (1) provide loan origination, loan servicing, investment advisory, asset management and other related services and (2) invest in real estate operating partnerships.

minimum internal controls in place at the Company were inadequate to ensure accurate financial accounting and disclosures by the Company.  Specifically, the Individual Defendants failed to: (i) maintain a sufficient complement of personnel with the requisite knowledge of Generally Accepted Accounting Principles ("GAAP") commensurate with the Company's financial reporting requirements and business activities; (ii) maintain or disseminate accounting policy guidance with a sufficient level of precision to enable Company personnel to adequately apply accounting policies in accordance with GAAP; (iii) emphasize the need to maintain effective controls to monitor results of operations in accordance with GAAP; (iv) design and implement exception and monitoring reports to review transactions and detect errors in journal entries regarding financial accounting; (v) maintain effective controls over the identification and disclosure of the Company's segments, reporting the Company's segment performance differently for external reporting purposes than to the Company's chief operating decision maker; and (vi) maintain sufficient preventive internal controls to ensure that it complied with its contractual agreements.  Moreover, the Individual Defendants failed to act in good faith to correct the deficiencies in MuniMae's internal controls, despite being put on notice of the substantial material deficiencies in the Company's accounting and disclosure procedures by numerous "red-flags," including the Company's own admission of its defective internal controls.

3.     The deficiencies in the Company's internal controls began to be uncovered on March 10, 2006, when MuniMae announced that it would be necessary for the Company to restate its historical financial statements for the first three fiscal quarters of 2005, as well as fiscal years 2002 through 2004.  However, after the Individual Defendants caused the Company to file restated financial statements on June 22, 2006, which acknowledged numerous material weaknesses in the Company's internal controls and detailed a number of remedial measures

purportedly already implemented or in the process of being implemented to correct the deficiencies, less than three months later the Company announced the need for further restatement of the previously restated financial statements.

4. This second restatement, announced on September 10, 2006, has dragged on for more than a year and a half and has cost the Company more than $54 million in 2007 alone. During this process the Individual Defendants continued to uncover additional material weaknesses in the Company's internal controls that resulted in additional accounting errors. Then, on January 28, 2008, MuniMae announced that the Company would not be able to timely complete its second restatement by March 3, 2008 as previously announced, and as a result MuniMae's stock would be delisted from the New York Stock Exchange ("NYSE"). Moreover, the Company would be forced to drastically reduce its first quarter dividend to $.33 per share, down nearly $.20 per share from the previous quarter's dividend of $0.525 per share. The very next day, the Company announced wide-ranging changes in its accounting policies. Following these two announcements MuniMae's stock price collapsed, closing at $9.19 per share, down $8.01 from the stock's closing price of $17.20 on January 28, 2008, which represents a decline of nearly 47%. Finally, on April 9, 2008, the Company released its still unaudited financial results, disclosing that as a result of the restatement, shareholders' equity in the Company for the fiscal year ended December 31, 2005 had been reduced by $44.974 million.

## JURISDICTION

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

6.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

**PARTIES**

7.     Plaintiff Darold Harris is a shareholder of MuniMae, was a shareholder of MuniMae at the time of the wrongdoing alleged herein, and has been a shareholder of MuniMae continuously since that time.  Plaintiff Darold Harris is a citizen of the State of Michigan.

8.     Plaintiff James Kazol is a shareholder of MuniMae, was a shareholder of MuniMae at the time of the wrongdoing alleged herein, and has been a shareholder of MuniMae continuously since that time.  Plaintiff James Kazol is a citizen of the State of Ohio.

9.     Nominal Defendant MuniMae is a Delaware Limited Liability Company with its principal executive offices located at 621 East Pratt St., Suite 300, Baltimore, Maryland.  According to its public filings, MuniMae is a leading provider of debt and equity financing to real estate developers.  MuniMae also provides real estate investment management services, tax credit equity syndication services, asset management services and mortgage loan servicing.

10.     Defendant Mark K. Joseph ("Joseph") has served as Chairman of the Board since 1996.  Prior to January 1, 2005, he also served as the Company's Chief Executive Officer.  He also served as the President and a director of the managing general partner of SCA Tax-Exempt Fund Limited Partnership, the Company's predecessor, from 1986 through 1996.   Upon information and belief, defendant Joseph is a citizen of the state of Maryland.

11.     Defendant Michael L. Falcone ("Falcone") has served as a Director of the Company since 1999 and as the Company's Chief Executive Officer and President since January 1, 2005.   Previously, Falcone served as Chief Operating Officer from 1997 to 2005.   Upon information and belief, defendant Falcone is a citizen of the state of Maryland.

12.     Defendant Richard O. Berndt ("Berndt") has served as a Director of the Company since 1996 and is the Managing Partner of the law firm Gallagher Evelius & Jones LLP ("GEJ"). According to MuniMae's most recent proxy statement filed with the SEC on July 19, 2006, as of December 31, 2005, Berndt owned 5.7% of the equity of GEJ.   GEJ provides legal services to the Company, some of which are provided as part of real estate transactions and are paid for by the borrowers and some of which are paid directly by MuniMae.   For the year ended December 31, 2005, GEJ received $1.2 million in legal fees paid for by borrowers and $3.7 million in legal fees paid directly by MuniMae.   The $3.7 million in fees paid directly by the Company represented 19.5% of GEJ's total revenues for 2005, and MuniMae anticipated that it would transact an equal or greater amount of business with GEJ in 2006.   Upon information and belief, defendant Berndt is a citizen of the state of Maryland.

13.     Defendant Stephen A. Goldberg ("Goldberg") has served as General Counsel to MuniMae since July 2004.   Previously, Goldberg served as the principal counsel for MuniMae in his capacity as a partner at GEJ where he has represented MuniMae since 1985.   Goldberg is responsible for all aspects of the Company's legal affairs, including the supervision of the Company's internal and external counsel.   Goldberg remains a partner at GEJ.   The Company pays GEJ directly for Goldberg's legal services at his standard hourly rates, and Goldberg is eligible for an annual stock award, but otherwise receives no compensation directly from MuniMae.   Upon information and belief, defendant Goldberg is a citizen of the state of Maryland.

14.     Defendant Charles C. Baum ("Baum") has served as a Director of the Company since 1996 and as a member of the Company's Audit Committee of the Board (the "Audit Committee") and Compensation Committee of the Board (the "Compensation Committee") since at least 2002.  Upon information and belief, defendant Baum is a citizen of the state of Maryland.

15.     Defendant Eddie C. Brown ("Brown") has served as a Director of the Company since 2003 and as a member of the Audit Committee since March 25, 2003.  Upon information and belief, defendant Brown is a citizen of the state of Maryland.

16.     Defendant Robert S. Hillman ("Hillman") has served as a Director of the Company since 1996 and as a member of the Audit Committee and Chairman of the Compensation Committee since at least 2002.  Upon information and belief, defendant Hillman is a citizen of the state of Maryland.

17.     Defendant Barbara B. Lucas ("Lucas") has served as a Director of the Company and as a member of the Compensation Committee since 2005.  Upon information and belief, defendant Lucas is a citizen of the state of Maryland.

18.     Defendant Douglas A. McGregor ("McGregor") has served as a Director of the Company since 1999 and as a member of the Compensation Committee since at least 2002.  Upon information and belief, defendant McGregor is a citizen of the state of New Hampshire.

19.     Defendant Arthur S. Mehlman ("Mehlman") has served as a Director of the Company and as a member of the Audit Committee since 2004.  Until 2002, defendant Mehlman was a Partner at the independent registered public accounting firm KPMG, LLP.  Upon information and belief, defendant Mehlman is a citizen of the state of Maryland.

20.     Defendant Fred N. Pratt, Jr. ("Pratt") has served as a Director of the Company and as a member of the Audit Committee since 2003, chairing the Audit Committee since 2005.

Upon information and belief, defendant Pratt is a citizen of the commonwealth of Massachusetts.

21.     Defendant Earl W. Cole, III ("Cole") is MuniMae's Executive Vice President for Corporate Credit and Portfolio Management since 2003.   Cole started with the Company's predecessor, the SCA Tax-Exempt Fund, in 1989.   As the Company's Chief Credit and Real Estate Officer, he is responsible for setting and maintaining the Company's credit, underwriting and asset management policies, procedures and best practices and overseeing its investment approval processes.   In this capacity, Cole participates in the Company's Loan and Investment committees and chairs its Real Estate Investment Committee.   Prior to assuming his current role, Cole oversaw the loan servicing, construction management and asset management functions of the Company's real estate portfolio.   Upon information and belief, defendant Cole is a citizen of the state of Maryland.

22.     Defendant Melanie M. Lundquist ("Lundquist") served as Executive Vice President and Chief Financial Officer ("CFO") of the Company from January 1, 2006 to July 10, 2007.   Lundquist joined the Company in March 2005 as Senior Vice President and Chief Accounting Officer.   Upon information and belief, defendant Lundquist is a citizen of the state of Maryland.

23.     Defendant William M. Harrison ("Harrison") served as Senior Vice President, CFO and Secretary of the Company from April 2001 to December 31, 2005.   Harrison was responsible for the financial operations of the Company.   As president of Strategic Business Service, Inc., a consulting firm he founded in 2000, Harrison provided consulting services to the Company from November 2000 through April 2001.   Upon information and belief, defendant Harrison is a citizen of the state of Maryland.

24.     Defendant David Kay ("Kay") has served as CFO of the Company since November 2007.  As CFO of MuniMae, Mr. Kay is responsible for overseeing all elements of the Financial, Accounting, and certain Administrative functions, including Accounting Policy, Treasury and Corporate Capital Raising, External Reporting, Financial Planning, Taxes and Corporate Accounting.  Previously, Kay spent 20 years at the independent registered public accounting firm Arthur Andersen, LLP, where he ended his tenure as Managing Partner of the Mid-Atlantic Accounting, Audit and Risk Management Services.  Upon information and belief, defendant Kay is a citizen of the commonwealth of Virginia.

25.     Defendant Charles M. Pinckney ("Pinckney") has served as the Chief Operating Officer of the Company since July 2007 and served as interim CFO from July 2007 to November 2007.  Mr. Pinckney is responsible for each of the business units of MuniMae (MMA Realty Capital, MMA Financial, MMA Renewable Ventures, and International Housing Solutions) as well as the oversight of all elements of the Financial, Accounting, and Administrative functions within the company including Capital raising, Treasury, Financial Planning & Strategy, Accounting, Internal Audit, Information Technology and Human Resources.  Pinckney formerly served as head of MMA Realty Capital, the subsidiary that handled the Company's Merchant Banking, Investment Management and Agency Investing businesses.  Pinckney joined the Company in 2000 when MuniMae purchased Whitehawk Capital, a business Pinckney co-founded and that was engaged in structural finance activities.  Upon information and belief, defendant Pinckney is a citizen of the state of Florida.

26.     Collectively defendants Joseph, Falcone, Berndt, Goldberg, Baum, Brown, Hillman, Lucas, McGregor, Mehlman, Pratt, Cole, Lundquist, Harrison, Kay and Pinckney are referred to herein as the "Individual Defendants."

27.     The Individual Defendants together with MuniMae are referred to herein as the "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

28.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

29.     The Individual Defendants because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of the Company were required to, among other things:

        a.      exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

        b.      exercise good faith to ensure that the Company was operated in a

diligent, honest and prudent manner and complied with the Company's by-laws and all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

c.      exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP;

d.      exercise good faith in supervising the preparation and filing of all financial statements and other financial information required by law, and in examining and evaluating the financial statements and other information concerning the financial affairs of the Company; and

e.      when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct and prevent its recurrence.

31.     The Individual Defendants, particularly Joseph, the former CEO, Falcone, the current CEO, CFOs Lundquist, Harrison and Kay, and Audit Committee members Baum, Brown, Hillman, Mehlman and Pratt, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  Among other things, the Individual Defendants were required to:

(1)      make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)      devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that --

(a)      transactions are executed in accordance with management's general or specific authorization;

(b)      transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

32.     According to MuniMae's Audit Committee Charter, the Audit Committee (Baum, Brown, Hillman, Mehlman and Pratt) has, among other things, the following responsibilities:

a. Monitor the integrity of the financial reporting process and systems of internal controls of Municipal Mortgage & Equity, LLC (the "Company");

b. Monitor the Company's compliance with legal and regulatory requirements;

c. Monitor the independence, qualifications and performance of the Company's independent public accountants and internal audit function;

d. Cause to be prepared and approve the report required to be included in the Company's annual proxy statement as required by rules of the Securities and Exchange Commission (the "SEC");

e. Review with representatives of management and the independent public accountants the Company's audited financial statements prior to their filing as part of the annual report on Form 10-K. These discussions shall include consideration of the quality of the Company's accounting principles as applied in its financial reporting, which would entail review of estimates, reserves and accruals, review of audit adjustments whether or not recorded and such other inquiries as may be appropriate. Based on the review, the Committee shall make its recommendation to the Board as to the inclusion of the Company's audited financial statements in the Company's Annual Report on Form 10-K;

f. Consider the integrity of the Company's financial reporting process and controls in consultation with management and the Company's independent public accountants. Discuss significant financial risk exposures and the steps management has taken to significant findings prepared by the independent public accountants and the internal audit function together with management's responses, including the status of previous recommendations;

g. Review with financial management and the independent auditors the Company's quarterly financial results prior to the release of earnings and/or the Company's quarterly financial statements prior to filing or distribution of the Company's Quarterly Reports on Form 10-Q;

h. On at least an annual basis, review with the Company's inside and outside counsel any legal matters that could have a significant impact on the Company's financial statements, the Company's compliance with applicable laws and regulations and inquiries received from regulators or governmental agencies;

     i.       Periodically review management's monitoring of the Company's compliance with its Code of Ethics and Principles of Business Integrity, and ensure that management has the proper review system in place to ensure that the Company's financial statements, reports, and other financial information disseminated to governmental organizations and the public satisfy legal requirements;

     j.       Discuss the Company's policies with respect to risk assessment and risk management, including the Company's major financial accounting and risk exposures and the steps management has undertaken to control them;

     k.      Discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies; and

     l.       Take, or recommend that management take, appropriate measures to rectify any fraud or other accounting or financial reporting irregularities discovered by the Committee and, in connection therewith, engage senior management and inside and/or outside counsel, as appropriate, in connection therewith.

## FACTUAL ALLEGATIONS

33.     On March 10, 2006, MuniMae announced that the Company would have to restate it earnings for fiscal years 2002, 2003 and 2004 and the first three fiscal quarters of 2005 in a press release entitled "MuniMae to Restate GAAP Net Earnings."  Therein, the Company stated, in relevant part:

> Municipal Mortgage & Equity, LLC, also known as MuniMae (NYSE: MMA), announced today that it will restate net earnings for the nine month period ended September 30, 2005 as well as fiscal years 2004, 2003 and 2002 resulting in higher aggregated net earnings over this period than previously reported. This restatement does not impact cash available for distribution (CAD) in any period. CAD is a supplemental non-GAAP performance measure reported by the Company in addition to net earnings.

> For the nine months ended September 30, 2005, and year ended December 31, 2004 the Company will be increasing previously reported net earnings by $10.5 million ($.27 per diluted share) and $19.4 million ($.56 per diluted share), respectively. For the years ended December 31, 2003 and 2002, the Company will be

decreasing net earnings by $4.2 million ($.15 per diluted share) and $2.6 million ($.09 per diluted share), respectively. The adjustments described above are subject to the completion of the review by the Company's independent registered public accountants.

In connection with its fourth quarter financial reporting processes, the Company identified the need to record certain adjustments related to four main areas: 1) recognition of syndication fees, 2) application of equity method accounting, 3) recognition of interest income, and 4) amortization of mortgage servicing rights. As a result of the efforts necessary to reflect the restatements of prior periods, the Company expects to file for a 15 day extension to file its annual report on Form 10-K for the year ended December 31, 2005. Currently, the Company expects that it will file its 2005 Form 10-K before the expiration of this extension.

34.     On March 17, 2006, MuniMae filed with the SEC a Form 12b-25 indicating that the Company would be delinquent in filing its Annual Report on Form 10-K.  In this filing, the Company declared that it expected to complete the restatement and file the Company's Form 10-K for the fiscal year ended December 31, 2005 ("2005 Form 10-K") by March 31, 2006.

35.     On April 11, 2006, MuniMae announced unaudited financial results for the fourth quarter of 2005  in a press release entitled, "MuniMae Reports Financial Results," which stated, relevant part:

In recognition of these outstanding achievements, the Company's Board of Directors approved the 36th consecutive increase in the quarterly distribution that was paid to shareholders on February 10, 2006. The distribution of $.4925 per share represents a 4% increase from the comparable distribution last year. On an annualized basis, the distribution equates to $1.97 per common share and represents a 7.5% yield based on the April 10, 2006 closing price of $26.35 per share. The stated yield does not give effect to any tax savings investors may realize from the portion of the distribution that is exempt from Federal income taxes.

Commenting on the Company's strong performance, Michael L. Falcone, Chief Executive Officer stated, "We accomplished a great deal in 2005. We closed the acquisitions of MONY Realty Capital and Glaser Financial which significantly expanded the mortgage banking products we offer as well as the services we can provide to

institutional investors. In addition, we reorganized our operations to improve profitability and client service for many years to come. **With greater diversity of revenue sources, a more efficient operating platform and a distribution that represents a lower percentage of CAD, MuniMae is well positioned for continued growth over the long-term**."

36.     MuniMae finally filed the 2005 Form 10-K on June 22, 2006.  In the 2005 Form 10-K, MuniMae identified the following deficiencies in the Company's disclosure controls and procedures: (1) an ineffective control environment; (2)  an ineffective financial reporting process; (3) a lack of effective controls over the accuracy of accounting for the tax credit equity business; (4) a lack of effective controls over the accuracy of accounting for the deferral and recognition of bond and loan origination fees and direct costs; (5) a lack of effective controls to ensure accurate application of the equity method of accounting for investments in certain partnerships; (6) a lack of effective controls over the identification and valuation of certain derivative financial instruments; and (7) a lack of effective controls over the accounting for income taxes.  Specifically, the 2005 Form 10-K stated, in relevant part:

> An evaluation was conducted under the supervision and with the participation of management, including the CEO and CFO, on the effectiveness of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act as of December 31, 2005. Based on this evaluation, the CEO and CFO concluded that, **as a result of the material weaknesses set forth below, our disclosure controls and procedures were not effective as of December 31, 2005**.

> As part of our financial reporting process and during the preparation of this Annual Report, management identified certain errors in our previously issued financial statements and concluded it was necessary to restate our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, management concluded that our internal control over financial reporting was not effective as of December 31, 2004, and at the end of each of the first three quarters of 2005.

*       *       *

Under the supervision and with the participation of management, including our CEO and CFO, we conducted an evaluation of the effectiveness of the company's internal control over financial reporting as of December 31, 2005 based on the criteria related to internal control over financial reporting described in "Internal Control—Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

A material weakness is a control deficiency, or a combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of annual or interim financial statements would not be prevented or detected. Management has identified the following material weaknesses as of December 31, 2005:

1. *Ineffective control environment*—We did not maintain an effective control environment as defined in the COSO framework. Specifically, we identified the following material weakness related to our control environment:

• We did not maintain a sufficient complement of personnel with a level of accounting knowledge and experience in the application of GAAP commensurate with our financial reporting requirements and business activities, particularly as our business grew in diversity and complexity.

• We did not maintain or disseminate accounting policy guidance with respect to certain areas with a sufficient level of precision to enable existing personnel to adequately analyze related transactions and apply accounting policies that were in conformity with GAAP.

• Our control environment did not emphasize the need to maintain effective controls to monitor results of operations determined in accordance with GAAP. Specifically, we did not budget net earnings and did not maintain a process to monitor net earnings results against expected results.

These material weaknesses contributed to the material weaknesses discussed below in items 2 through 7, and resulted in the restatement of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, these material weaknesses could result in a misstatement of any of substantially all our financial statement accounts and disclosures that would cause a material misstatement of the Company's annual

or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that these control deficiencies constitute material weaknesses.

2. ***Ineffective financial reporting process***—We did not maintain effective controls, including monitoring, over our financial close and reporting process. Specifically, we identified the following material weaknesses related to the financial reporting process:

• Controls over journal entry review and account reconciliations failed to prevent or detect material financial statement errors. In addition, we failed to design and implement exception and monitoring reports to review transactions and detect errors and to integrate our subsidiary and feeder systems with our general ledger system. As a result, our financial reporting process is manually intensive and is based on the review and approval of individual transactions (and resulting journal entries) without adequate compensating controls to detect errors.

• We did not maintain effective controls over the identification and disclosure of our segments. Specifically, we did not identify our segments or report their performance in the same manner for external reporting purposes and for reporting to our chief operating decision maker. This control deficiency resulted in segment disclosures that did not conform to GAAP.

These material weaknesses in our financial reporting process contributed to the material weaknesses discussed below in paragraphs 3 through 7, and resulted in the restatement of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and each quarter in 2004. In addition, these material weaknesses could result in a misstatement of any of substantially all our financial statement accounts and disclosures that would cause a material misstatement our annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that these control deficiencies constitute material weaknesses.

3. ***Accounting for tax credit equity business***—We did not maintain effective controls over the accuracy of our accounting for the tax credit equity business. Specifically:

• Accounting for real estate syndication fees—We did not correctly recognize syndication fees ratably as syndication partnerships invested in low income housing properties as required by GAAP. Instead, we (1) eliminated certain syndication fees

related to consolidated syndication partnerships and (2) recognized syndication fees as investors subscribed to our funds and when we selected or acquired interests in low income housing properties to be sold to syndication partnerships rather than when the syndication partnerships made investments.

•   Accounting for impairments of investments in real estate partnerships held by guaranteed tax credit equity funds—We presented equity in the impairment losses of low income housing properties owned by guaranteed tax credit funds and related revenues earned by providing related tax losses net instead of reporting these amounts separately as required by GAAP.

•   Accounting for consolidated tax credit equity funds—We did not correctly record or did not properly reverse certain adjustments to ensure consolidated amounts were in accordance with GAAP.

•   Accounting for capitalized interest costs associated with investments in real estate partnerships—We did not correctly capitalize interest costs on investments in real estate partnerships developing low income housing properties in accordance with GAAP.

This control deficiency resulted in the restatement of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and each quarter in 2004. In addition, this control deficiency could result in a misstatement of syndication fee income, equity in the earnings (losses) of partnerships, interest expense, and net earnings (losses) allocated to minority interest that would result in a material misstatement in our annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

4. *Accounting for deferral and recognition of bond and loan origination fees and direct costs*—We did not maintain effective controls over the accuracy of our accounting for the deferral and recognition of bond and loan origination fees and direct costs and the related amortization expense. Specifically, we failed to amortize our deferred bond and loan fees using the effective interest method over their contractual terms as required by GAAP rather than the straight-line method over terms anticipating prepayments. In addition, we failed to defer direct costs of originating bonds in accordance with GAAP and effectively monitor our recorded yields on bonds against our expected effective yields. This control deficiency resulted in the restatement

of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, this control deficiency could result in a misstatement of deferred bond and loan origination fees and the related amortization expense that would result in a material misstatement of our annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

5. ***Accounting for investments in partnerships using the equity method of accounting***—We did not maintain effective controls to ensure accurate application of the equity method of accounting for investments in certain partnerships. Specifically, we did not apply the equity method to an investment when our share of the investee's cumulative losses exceeded our original investment even though we had guaranteed certain obligations of the investee. In addition, we did not account for differences between our cost of an investment and the amount of underlying equity of the investee. We also did not correctly calculate our share of this investee's losses using our economic share of the entity. This control deficiency resulted in the restatement of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, this control deficiency could result in a misstatement of equity method investments and equity in their earnings (losses) that would result in a material misstatement of our annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

6. ***Identification and valuation of derivative financial instruments***—We did not maintain effective controls over the identification and valuation of certain derivative financial instruments. Specifically, we did not maintain effective controls to identify derivative financial instruments embedded within financial guarantees. In addition we did not maintain effective controls over the accuracy of assumptions used to value derivatives embedded within commitments to lend. This control deficiency resulted in the restatement of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, this control deficiency could result in a misstatement of derivative financial instruments and related gains (losses) that would result in a material misstatement of our annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes

a material weakness.

7. **Accounting for income taxes**—We did not maintain effective controls over the accounting for income taxes. We did not maintain effective controls over the completeness and accuracy of our income tax provision.

This control deficiency resulted in the restatement of our consolidated financial statements for the years ended December 31, 2004, 2003 and 2002, for each of the first three quarters in 2005 and for each quarter in 2004. In addition, this control deficiency could result in a misstatement of income taxes that would result in a material misstatement of our annual or interim financial statements that would not be prevented or detected. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

Because of the material weaknesses described above, management has concluded that our internal control over financial reporting was ineffective as of December 31, 2005.

Management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2005 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, whose opinion thereon is included herein.

37.    In response to these identified material weaknesses in the Company's internal controls and procedures, MuniMae announced substantial remedial measures purportedly already implemented, or being implemented, to correct the deficiencies.  The 2005 Form 10-K sets forth these purported remedial measures:

**(c) Remediation of Material Weaknesses**

Management is responsible for maintaining effective internal control over financial reporting, including the adequacy of accounting resources and the quality of the financial reporting processes.

**Control environment**—In 2004, we recognized the need for additional qualified accounting personnel and began recruiting efforts. By the end of 2004, the accounting staff had more than doubled with most of the new hires starting in the second half of the year. We continued our efforts in 2005 by hiring two Assistant

Controllers, a Chief Financial Officer/Chief Accounting Officer and a Controller, each with over 15 years of real estate industry experience.

In 2005, the corporate accounting department was reorganized and the reporting structures of tax credit equity and fund management accounting and finance personnel were realigned to report through the corporate accounting and finance departments. These actions were taken, in part, to improve communication and the nature, extent and oversight of financial reporting controls.

We will continue to hire additional qualified staff, train existing staff, and assess the roles and responsibilities and related qualifications of the accounting staff to ensure that they are adequate to support our financial reporting requirements. Management will also improve the documentation and dissemination of clear accounting policies, particularly those related to accounting for the tax credit equity business, deferral and recognition of loan and bond origination fees and direct costs, the application of the equity method of accounting for investments in partnerships, identification and valuation of derivative financial instruments, accounting for income taxes and disclosures about our segments.

We will also perform a comprehensive review of our business segments, including developing and implementing performance measures and metrics to enhance monitoring controls and error detection efforts, and to more effectively integrate our accounting and financial reporting personnel into our operating businesses.

***Financial reporting process***—Management has taken certain of the steps necessary to remediate the weaknesses related to its financial reporting process including:

    i.    increasing the levels of review for complex and judgmental accounting issues, including key estimates;

    ii.    developing analyses that aggregate similar transaction types, correlate balance sheet and income statement accounts and better support account balances; and

    iii.    training staff.

Management will continue these efforts in 2006 by:

    i.    hiring additional qualified staff with significant relevant experience;

ii.     establishing a group dedicated to improving the use of technology to automate analyses, provide direct interfaces from subsidiary systems, and aggregate and process transactions;

iii.    developing accounting models related to each of our business activities to train and be used by accounting staff to reduce errors in recording recurring transactions;

iv.     developing standard reporting for each of our business units, including exception reports to assist in error detection;

v.      establishing and documenting formal accounting policies;

vi.     continuing its overall training efforts;

vii.    simplifying its accounting processes; and

viii.   establishing relationships between accounting staff and key business personnel to proactively manage the accounting implications of prospective transactions.

38.     However, less than three months later, on September 13, 2006, MuniMae announced the need for further restatement of the Company's historical financial statements in a press release entitled, "MuniMae to Restate Consolidated Financial Results," which stated, in relevant part:

Municipal Mortgage & Equity, LLC (NYSE: MMA), announced today that it will restate its previously filed consolidated financial statements for the three month period ended March 31, 2006 as well as for the years ended December 31, 2005, 2004, and 2003. The restatement will not impact cash available for distribution, a supplemental non-GAAP performance measure reported by the Company in addition to net earnings, in any period, or the Company's ability to pay future distributions to common shareholders.

In connection with previously announced efforts to improve its financial reporting processes, the Company identified the need to record adjustments for errors related primarily to three main areas: accounting for syndication fees, accounting for equity commitments related to affordable housing projects and the classification of cash received from investors in guaranteed tax

credit equity funds. These items are more fully discussed in a Form 8-K that was filed by the Company today.

39.     On October 26, 2006, MuniMae filed with the SEC a Form 8-K announcing that, on October 20, 2006, the Company had dismissed its independent registered public accounting firm PricewaterhouseCoopers LLP.

40.     On December 8, 2006, MuniMae filed with the SEC a Form 12b-25, which stated in relevant part:

> As described in the registrant's Current Report on Form 8-K filed on September 13, 2006 (the "Current Report "), on September 7, 2006 the Audit Committee of the Board of Directors of the registrant concluded, based upon the recommendation of its management, that certain previously filed financial statements covering the fiscal years ended December 31, 2005, 2004 and 2003, and the quarterly periods within those years, and the quarterly period ended March 31, 2006 (the " Affected Financial Statements ") should be restated to reflect adjustments to correct certain errors therein and summarized in the Current Report.
>
> As a result of the dedication of significant management resources to these efforts, the registrant was unable to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2006 within the prescribed time period.
>
> Management has previously determined that as of December 31, 2005 the registrant's internal controls over financial reporting were not effective due to the material weaknesses disclosed within item 9A of the registrant's Annual Report on Form 10-K for the year ended December 31, 2005. In connection with the restatement of the Affected Financial Statements, management has evaluated the impact of these accounting errors on the effectiveness of the registrant's internal controls over financial reporting as of December 31, 2005 and determined that the misapplications of generally accepted accounting principles noted in the Current Report were further instances of certain of the material weaknesses previously identified as of December 31, 2005.
>
> ***In addition, since the filing of the registrant's Quarterly Report on Form 10-Q for the quarter ended March 31, 2006, the registrant has identified an additional material weakness in its internal control over financial reporting. The registrant did not maintain effective policies and procedures over the accounting***

*for certain of its employee benefits*. Specifically, it did not properly accrue annual carryover vacation benefits due to its employees or vacation benefits due to its employees upon voluntary termination. In addition, the registrant erroneously calculated compensation expense related to deferred shares granted in 2006. *This control deficiency resulted in a misstatement of employee benefit costs and more than a remote likelihood that a material misstatement of the registrant's annual or interim financial statements would not be prevented or detected. Accordingly, management of the registrant has concluded that this control deficiency constitutes a material weakness*.

41.      On May 4, 2007, MuniMae filed with the SEC a Form 12b-25 disclosing additional material weaknesses in the Company's internal controls.  Specifically, the Company stated, in relevant part:

> Management has previously determined that as of December 31, 2005 the registrant's internal controls over financial reporting were not effective due to the material weaknesses disclosed within item 9A of the registrant's Annual Report on Form 10-K for the year ended December 31, 2005. In connection with the restatement of the Affected Financial Statements, management has evaluated the impact of these accounting errors on the effectiveness of the registrant's internal controls over financial reporting as of December 31, 2005 and determined that the misapplications of generally accepted accounting principles noted in the Current Report were further instances of certain of the material weaknesses previously identified as of December 31, 2005.
>
> In addition to these material weaknesses and the material weakness described in the registrant's Form 12b-25 with respect to its Quarterly Report on Form 10-Q for the quarter ended September 30, 2006 (related to policies and procedures over the accounting for certain of its employee benefits), since the date of the filing of that Form 12b-25 *the registrant has identified additional material weaknesses in its internal control over financial reporting*:

1. *The registrant did not maintain effective policies and procedures over the accounting for accrued expenses*. Specifically, it did not properly accrue professional services costs in the period in which the services were rendered. In addition, the registrant erroneously accrued costs for legal contingencies for which the risk of loss was not both probable and reasonably estimable;

2. *The registrant did not maintain sufficient preventive internal controls to ensure that it complied with its contractual agreements*; and

3. *The registrant did not maintain effective policies and procedures over the identification of entities requiring consolidation*. Specifically, we have determined that we are required to consolidate certain entities not previously consolidated. The determination to consolidate these entities, primarily tax credit equity funds of which we are the sponsor, results from our conclusion that we are the primary beneficiary of a variable interest entity, or, we are the general partner of a partnership and we do not overcome the presumption of control of the partnership since the limited partners have neither kick-out rights nor substantive participating rights.

These control deficiencies resulted in misstatements of our financial statements and more than a remote likelihood that a material misstatement of the registrant's annual or interim financial statements would not be prevented or detected. Accordingly, management of the registrant has concluded that these control deficiencies constitute material weaknesses.

*In addition, the registrant has identified additional errors in the accounting for the tax credit equity business, which was previously disclosed as a material weakness within item 9A of the registrant's Annual Report on Form 10-K for the year ended December 31, 2005. The registrant did not maintain effective policies and procedures over the accounting for tax credit equity fund start-up costs and costs of acquiring investments in partnerships. Specifically, it*:

- *Did not expense start-up costs as incurred as required by AICPA Statement of Position 98-5, Reporting on the Costs of Start-up Activities*; and

- *Incorrectly classified costs of acquiring investments in partnerships developing affordable housing projects as*

> *required by Statement of Financial Accounting Standards No. 67, Accounting for Costs and Initial Rental Operations of Real Estate Projects.*

The registrant is developing remediation plans to address these material weaknesses.

42. On the same day, the Company issued a press release entitled "MuniMae Announces 41st Consecutive Increase in Quarterly Distribution," which stated, in relevant part:

> Municipal Mortgage & Equity, LLC ("MuniMae" or "the Company," NYSE:MMA) *announced that yesterday its Board of Directors declared a distribution of $0.5175 per common share payable on May 23, 2007 to shareholders of record as of May 10, 2007. This represents a 4% increase over the distribution for the comparable period last year. On an annualized basis, the distribution equates to $2.07 per common share and represents a 7.5% yield based on the May 3, 2007 closing price of $27.56 per share.* Although a portion of the income allocated to shareholders may qualify for exemption from Federal income taxes, the stated yield does not reflect potentially higher net returns investors may realize compared with other investments. The Company also confirmed that assuming it is able to execute its capital plan and the business performs in accordance with management's plans, the Company will continue with its quarterly distribution policy. In July or August 2007, the Company intends to provide a mid-year review of its investment originations as compared to the first half of 2006. *Michael L. Falcone, Chief Executive Officer stated, "Our business is performing well. MMA Financial continues to be widely recognized as a leader in affordable housing finance, and we are encouraged by the prospects from MMA Realty Capital, and longer-term, our new business initiatives. We are pleased to be able to increase our cash distribution to shareholders and are very proud of our more than 10 year history of consistent growth in quarterly cash distributions."*

> The Company also announced updated information on its ongoing efforts to complete the restatement of its previously filed consolidated financial statements as well as its 2006 consolidated financial statements. The Company has prioritized its restatement efforts by initially focusing its efforts on completing the audited financial statements of two key subsidiaries, MuniMae TE Bond Subsidiary, LLC ("TE Bond Sub") and MMA Mortgage Investment Corporation ("MMIC"). Completing these subsidiary level financial statements facilitates the Company's access to sources of capital and its ability to continue to originate mortgage

loans that are ultimately sold to government-sponsored enterprises, such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The Company currently expects that the audited financial statements of TE Bond Sub and MMIC will be completed during the second quarter of 2007.

*As a result of prioritizing the completion of these subsidiary level audited financial statements, the need to consolidate the majority of the low income housing tax credit equity funds in which it holds interests, and its ongoing restatement efforts, the Company currently expects to file its 2006 annual report on Form 10-K on or before November 30, 2007. As the Company's restatement effort has progressed, additional material weaknesses in its controls over financial reporting have been identified. Consistent with previously identified matters, the Company is developing and implementing remediation plans to address these weaknesses. The Company has met with all its lenders to update them on its progress and current expectations. Further, the Company has obtained waivers from all its lenders which provide for an extension for submitting the 2006 Form 10-K by November 30, 2007, and it is currently in compliance with all of its debt covenants.*

Since the Company did not file its 2006 annual report on Form 10-K in a timely fashion, the Company was notified by the New York Stock Exchange ("NYSE") that the NYSE would monitor the Company's filing status for a period of six months from the due date of the 10-K. For companies that are unable to file their annual reports within six months from the required due date, the NYSE may, in its sole discretion, allow the company's securities to trade for up to an additional six month period. Management of the Company met with representatives of the NYSE to provide an update on the progress of its restatement efforts and current expectations for completion. The Company informed the NYSE that it expects to formally request an extension from the NYSE to continue listing its common shares beyond September 1, 2007 once the six month period commencing on the due date for the annual report has elapsed, however, there can be no assurances that such extension will be granted. Management plans to update its lenders and the NYSE on a regular basis as it makes progress in its restatement efforts. *The Company continues to cooperate fully with the Securities and Exchange Commission in connection with its non-public, informal inquiry.*

43.     On July 10, 2007, MuniMae announced the resignation of defendant Lundquist as

CFO of the Company, issuing a press release entitled "MuniMae Announces Organizational

Changes,"  which stated, in relevant part:

> July 10, 2007, Municipal Mortgage & Equity, LLC ("MuniMae" or
> the "Company," NYSE: MMA) today announced that Charles M.
> Pinckney has been named Chief Operating Officer and that it has
> accepted the resignation of Melanie M. Lundquist, the Company's
> Chief Financial Officer. Mr. Pinckney will also serve as interim
> Chief Financial Officer while the Company searches for a
> replacement for Ms. Lundquist. The Company today also
> announced the completion of the audited financial statements for
> MuniMae TE Bond Subsidiary, LLC ("TE Bond Sub"), the
> subsidiary that holds the majority of the Company's tax-exempt
> bond investments.
>
> Ms. Lundquist, who joined the Company in 2005 from The Rouse
> Company, has accepted an offer to become the Chief Financial
> Officer of Haven Custom Homes, Inc. Michael L. Falcone, the
> Company's Chief Executive Officer and President, commented,
> "We are grateful to Melanie for all of her leadership, including her
> work that led to the completion of the TE Bond Sub financial
> statements. We remain strongly committed to completing the
> restatement efforts, and the Company will continue to devote itself
> to bringing these efforts to fruition." He added, "We are excited
> that Charlie has stepped into an expanded role, and we anticipate
> that he will bring a wealth of experience, leadership and focus to
> the Company's operations. In the short term, he will be focused on
> bringing the Company's restatement efforts to conclusion."
>
> *       *       *
>
> The Company today also announced that it has engaged Navigant
> Consulting, Inc. to support Mr. Pinckney's efforts to complete the
> Company's restatement efforts. Mr. Falcone added, "The Company
> is fortunate to have engaged the services of the Navigant team.
> Their track record with complex accounting and restatement issues
> is an invaluable asset and, coupled with Charlie's skilled
> leadership and operational expertise, we believe that we have the
> pieces in place to complete our efforts and emerge a stronger
> enterprise."
>
> As previously disclosed, the Company has focused its efforts on
> completing the audited financial statements of TE Bond Sub and
> another of its subsidiaries, MMA Mortgage Investment

Corporation ("MMIC"), as it simultaneously continues its efforts to complete the restatement of its financial statements and finalize its 2006 annual report. Mr. Falcone stated, "Completing the TE Bond Sub audit is a very important step along the road toward the completion of our restatement efforts and the filing of our 2006 annual report. As a result of non-cash restatement adjustments, shareholders' equity in TE Bond Sub (whose common stock is 100% owned by the Company) as of December 31, 2005 was approximately $52.9 million higher than the $272.5 million previously reported and net income for TE Bond Sub for the year then ended was approximately $11.9 million lower than the $37.5 million previously reported."

These restatement adjustments consist largely of corrections for errors related to the Company's estimation of the fair value of bonds (which increased shareholders' equity in TE Bond Sub by approximately $66.9 million as of December 31, 2005) and the Company's assessment of bond impairments (which decreased shareholders' equity in TE Bond Sub by approximately $14.1 million as of December 31, 2005), for the net increase of $52.9 million mentioned above, including certain other adjustments. The effects of these restatement adjustments are not necessarily indicative of the effects of other restatement adjustments that may be required in the Company's financial statements.

Certain other subsidiary level audited financial statements, specifically some of those for funds the Company manages on behalf of others, have also been completed and provided to the appropriate investors.

The Company is continuing to work towards completing the audited financial statements of MMIC and has obtained extensions through August 31, 2007 from the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), each of which require audited MMIC financial statements. In addition, the Company has obtained waivers through August 31, 2007 from those of its lenders that require delivery of audited financial statements for MMIC, and it is currently in compliance with all of its debt covenants.

The Company reiterated its intent to provide a mid-year review of the Company's performance in late July or August. At that time, the Company also expects to provide more information on the timing of the completion of MMIC's financial statements.

The Company today also announced information about material weaknesses in its internal controls over financial reporting that

were identified by management during the preparation of the
financial statements of TE Bond Sub and MMIC. Details about
these material weaknesses, and others that have been identified as
the Company's restatement efforts have progressed, are included in
a Current Report on Form 8-K filed by the Company today.

44.     Then on August 2, 2007, certain of the Individual Defendants conducted a
conference call.  The prepared remarks for this conference call, which had no question and
answer session, were attached to a Form 8-K filed with the SEC on August 7, 2007 and state, in
relevant part:

> **Mike Falcone**:
>
> Good afternoon everyone, and welcome. We are glad you are able
> to join us today. With me on the call today are Charlie Pinckney,
> our COO and interim CFO, Gary Mentesana (who runs our
> affordable housing business), Earl Cole (who is our chief credit
> officer and interim head of our commercial real estate finance
> business), Matt Cheney (who runs our renewable energy finance
> business) and Jenny Netzer (who is in charge of new business
> development).
>
> Before we get into the "meat" of the call, I would like to make two
> introductory points. First, there has clearly been a lot of trepidation
> in the financial markets about recent developments in the sub-
> prime mortgage lending markets and their potential effects on the
> broader markets, especially the CMBS market. *Let me restate that
> the company is not engaged in sub-prime or any other single
> family mortgage lending activities. In fact, the debt and equity
> financings arranged by the company in the housing sector are
> strictly for multi-family rental properties, and our outlook for the
> multi-family rental sector is positive.* Given recent weakness in the
> CMBS and CDO world, I also want to make clear that we do not
> own any CMBS or CDO securities, and, in fact, we believe that
> weakness in those markets generally creates a competitive
> advantage for us. Our business is to arrange debt and equity
> financing for commercial real estate, affordable rental housing and
> clean energy projects. *As you'll note when we describe our
> production for the first half of 2007, we don't know of any
> business development that would give rise to the current decline
> in our stock price*. We assume but of course we can't be certain
> that we are being treated like a subprime lender or CMBS investor,
> which we most definitely are not.

Second, we should be clear what this call is, or rather is not. This is not an earnings call. Because of our pending restatement we cannot speak to earnings, only production. In that regard, we want to assure you that we are very focused on getting the restatement successfully completed.

***As we have stated previously, assuming we can continue to execute on our capital plan and our business continues to perform as we expect, management plans to ask the Board to maintain the current dividend policy, and in that regard, I am very pleased to announce that yesterday, our Board of Directors declared a distribution of $0.5225 per common share payable on August 22, 2007 to shareholders of record on August 8, 2007. This represents an approximately 4% increase over the distribution for the comparable period last year. This distribution represents the company's 42nd consecutive increase in its quarterly distribution. We are pleased to be able to increase our cash distribution to shareholders and are very proud of our more than 10 year history of consistent growth in quarterly cash distributions.***

I will now move to a review of the highlights of our performance for the first half of 2007, and after that Charlie will speak briefly about his new role with the company. As you may be aware, on July 10, 2007 the company announced that Charlie had been named chief operating officer and interim chief financial officer. Following Charlie's presentation, Gary, Earl, Jenny and Matt will each speak briefly about the significant developments during the first half of the year within their respective business units.

Overall our production for the first half of the year exceeded our production for the first half of 2006. During the first half of 2006, the dollar value of our total production across all business lines was approximately $1.4 billion. During the first half of 2007, the dollar value of our total production across all business lines (which we'll break down in greater detail later) was approximately $1.9 billion, including approximately $290 million in production related to an acquisition during the period. Although production in our affordable housing business during the first half of 2007 was down against last year, performance in our market rate business and our new business initiatives was up in comparison to last year, and Gary, Earl, Jenny and Matt will drill down further on 2007 performance metrics in a moment. Margins have varied among the business units, but across the company they have held up. We have seen compression in some product lines but expansion in others.

*       *       *

**Charlie Pinckney**:

*        *        *

To date, the transition to my new role has been smooth. Melanie Lundquist, formerly our CFO, agreed to stay on for a transition period, and she has been helpful both to me over the past few weeks and the Navigant team throughout their engagement in aiding with the transition. As I mentioned, Navigant Consulting offers a wealth of resources to our ongoing restatement efforts as well as a fresh perspective on the challenges confronting the company's corporate accounting and finance department. We feel that the recent and relevant restatement experience of the principals who are working with us (including working on both Fannie Mae's and Freddie Mac's restatement efforts) makes them uniquely qualified to assist us. In addition, we have incentives in place for key senior accounting staff designed to encourage their dedication through the completion of the restatement process.

***Although we have previously announced our intention to complete our restatement efforts in time for filing our annual report by November 30, 2007, and we continue to work towards this goal, we believe that there is a significant risk that we won't be able to make this date. We have asked Navigant Consulting to work toward the November 30 date, but they are not far enough along in their work for us to say with certainty what the exact date will be. What we can say is that we are devoting as many resources as we can to getting this done as soon as we can, and we certainly expect to finish our efforts within the first two months of 2008***.

*        *        *

*Gary Mentesana*:

Thanks, Charlie. As you may know, MMA Financial is responsible for all of the company's affordable housing finance, tax credit equity, tax-exempt bonds and taxable lending operations. We generate revenues through the origination, syndication, financing and management of debt and equity investments secured primarily by affordable multifamily housing projects.

During the first six months of 2007, MMA Financial's total production, including both debt originations and equity placements, was $680 million, down somewhat from total production of $821 million during the same period in 2006:

- Debt originations during the first half of 2007 totaled $138 million (which included $31 million in private placement bonds, $14 million in taxable construction loans and $93 million in taxable agency loans), as compared to approximately $170 million during the first half of 2006 (which included $144 million in private placement bonds, $5 million in taxable construction loans and $21 million in taxable agency loans).

- LIHTC equity syndicated during the first half of 2007 totaled $318 million from 12 different capital partners. Of this amount, $183 million was syndicated through our guaranteed program. During the first half of 2006, approximately $481 million of equity was syndicated from 10 different capital partners, none of which was through our guaranteed program.

- The remaining $224 million of production through June 30 consisted of debt acquired within the Tender Option Bond (TOB) program as compared to $169 million during the same period in 2006 (I should note that we began this program in April of 2006).

As compared to prior periods, for the six months ended June 30, 2007 the debt business experienced greater competition resulting in lower origination fees and spreads to our cost of capital. However, we are benefiting from additional fees through a greater percentage of equity syndicated through our guaranteed program.

MMA Financial's production pipeline for the remainder of 2007 appears to be strong. Although we will continue to monitor the recent events within the capital markets that have the ability to impact our future production, we currently expect that the amount of equity we will syndicate this year will be in line with the amount syndicated in 2006 while the amount of debt that we will originate this year will materially exceed the volume originated in 2006.

***As for credit quality within our $1.5 billion private placement bond portfolio, we are seeing some meaningful improvement. Debt service coverage for the stabilized, fixed rate multifamily bonds in the portfolio remains stable at 1.14 as of June 30, 2007 (which is the same as the debt service coverage as of June 30, 2006). However, by original issue amount, bonds in default fell to 12% of the portfolio at June 30, 2007, down from 16% of the portfolio at June 30, 2006, and the number of bonds on our watch list fell to 14% of the portfolio at June 30, 2007, down from 19% of the portfolio at June 30, 2006.***

You've heard Mike and Charlie talk about our continuing restatement efforts, and in that regard the MMA Financial business unit has a large success to report in that area. As you may know, on July 10th the company announced that it had completed the audited financial statements for MuniMae TE Bond Subsidiary, the subsidiary that holds the majority of the Company's tax-exempt bond investments. Completing the TE Bond Sub audit is an important step along the road toward the completion of our restatement efforts and the filing of our 2006 annual report.

As a result of non-cash restatement adjustments, shareholders' equity in TE Bond Sub (whose common stock is 100% owned by the Company) as of December 31, 2005 was approximately $52.9 million higher than the $272.5 million previously reported and GAAP net income for TE Bond Sub for the year then ended was approximately $11.9 million lower than the $37.5 million previously reported. These restatement adjustments consist largely of corrections for errors related to the Company's estimation of the fair value of bonds and the Company's assessment of bond impairments, including certain other adjustments. The effects of these restatement adjustments are not necessarily indicative of the effects of other restatement adjustments that may be required in the Company's financial statements, but they offer some clarity on the impact of the restatement on TE Bond Sub's results.

*       *       *

*Earl Cole*:

Thanks, Gary. As Mike mentioned earlier, I am the Interim Head of MMA Realty Capital. I am not a stranger to MRC, as the head of risk management for the company, I have known and worked closely with the management of MRC for some time. I'm glad to have been invited to play a more direct role with this group.

MRC manages and directs the market rate real estate transactions pursued by MuniMae. We generally define these transactions as those that are not tax advantaged and do not generate tax credits or tax exempt income. We conduct the majority of this activity through two primary business units of MRC, the merchant banking and agency operations.

The merchant banking unit pursues debt and equity transactions on behalf of our investment partners as well as for our own account. In situations where we originate for third parties, we also act as asset managers, generating recurring income. These transactions cover a wide variety of investment types, from traditional

commercial mortgages to B note and mezzanine debt investments. Underlying collateral can be virtually any commercial real estate type, from industrial and retail properties to office and multi-family projects (but not single-family home mortgages and not CMBS or CDO securities).

The other major MRC business line, our agency business, manages all of the market rate multi-family project debt that we originate and underwrite for sale to the government sponsored entities, Fannie Mae, Freddie Mac and Ginnie Mae. We make these loans and then resell them to these agencies after we ensure that they meet all necessary requirements. After the sale, we remain engaged as the loan servicer, for which we collect a fee. Again, these loans do not include single-family home mortgages

We are pleased with MRC's production thus far in 2007, which results in part from decisions made earlier regarding how we wanted to move forward as a real estate investment firm. In late 2006 we discussed ways to better position MRC in response to the increased volatility in some US real estate markets; we decided that we needed to reduce our reliance on transaction based income and establish a critical mass in our asset management and servicing businesses. Accordingly, we began to shift our production focus in order to achieve a more efficient delivery of assets to our investment partners.

To do this, we began to emphasize higher quality assets that would satisfy the investment criteria of our partners. This move was designed to both manage credit risk and to build our recurring income. As a result, our third party origination has grown, we have moved away from certain assets types and asset management income will become more important over time.

Along with this targeted production focus, in 2007 we also established new investment funds and expanded our base of investment partners. These new resources allowed us to support strong Q1 and Q2 production.

MRC had production of just over $1 billion for the first six months of the year compared to approximately $606 million in the first half of 2006. Production was generated through a diverse set of products, and was geographically distributed in 14 states, representing practically all regions of the country. Of this total, $670 million in production came from our merchant banking business (including $290 million in production resulting from business lines acquired in the first quarter) and $350 million from the agency business. Together, this production represented an

increase of 68% above the production seen in the first half of 2006 (or approximately 21% excluding growth in production resulting from acquisitions). With respect to margins, compared to the same period last year margins seem to be holding up.

Merchant banking saw strong results in third party originations, as assets originated on behalf of other investors totaled $364 million for the first two quarters, an increase of 135% over 2006. This offset a decline in some other asset types, most notably land funding, where we purposely decided to reduce our risk and our exposure. As a result, land related debt origination declined by 63% to $90 million when compared to the first two quarters of 2006. We expect this shift to benefit us from a credit risk perspective, and allow us to rely on more predictable asset classes and income sources.

The agency business also had a strong start to 2007, with production up by 196% over 2006 levels to $350 million. This resulted as deliveries to Fannie, Freddie and Ginnie were up in almost every category. We achieved especially strong performances in originating and delivering taxable debt supporting stabilized properties to the agencies.

The high levels of production in our merchant banking unit and our agency business would not be possible without the support of our capital partners. These include banks which help us to finance our investments through lines of credit and other debt facilities and our investment partners, who purchase assets from us or fund them directly after we originate them.

Thus far in 2007 we have worked hard to increase the capacity and flexibility of our capital sources. In Q1 2007, we launched a new investment vehicle with a foreign pension fund that is already developing into one of our most promising new capital sources. Over the last seven months this fund has grown to become one of our most important sources of capital; by the end of this month, we expect to have delivered over $240 million of assets to this vehicle.

Additionally, during Q1 and Q2 we either renewed or expanded several credit facilities with our bank partners to support MRC activities.

In summary, the past two quarters have seen accelerating production at MRC in multiple product types with an expansion of our capital sources as well. Things have gone well and I am personally excited to be a part of this operation. This would not have been possible without the hard work of our employees and

the support of our capital partners. We would like to say thank you to both.

I'd now like to turn the presentation over to Matt for an update on the performance of our renewable energy finance business.

*        *        *

*Mike Falcone*:

**As I said earlier, we are pleased with our production performance so far in 2007. As in most years, the second half of the year looks to be a busier period for us than the first half**. Our success has been in large measure due to the hard work of our employees, their dedication to our values of integrity, innovation and service, and the strong support we have received from our capital partners and developer clients. We will continue to work hard to make this business grow and prosper, and we appreciate deeply your support as shareholders.

**We are obviously disappointed with our failings around our financial reporting, but we are committed to making our business stronger through the marriage of entrepreneurial spirit and strong financial controls. Again, I'd like to assure you that we are very focused on getting the restatement successfully completed**.

Additionally, although we are pleased to have been able to announce at the beginning of July our success in completing the financial statements for TE Bond Sub, we have not yet completed work on the financial statements for MMA Mortgage Investment Corporation, our commercial lending subsidiary, also known as MMIC. We are continuing to work to complete these efforts as well. The financial statements for this entity are fairly closely tied to the overall restatement efforts in the rest of the company and completing MMIC will depend to some extent on our overall timeline.

**Also, as we have previously reported, during our work on the restatement we have identified a number of weaknesses in our internal controls over financial reporting. Although I won't list them now, you can read about them in our previously filed reports, including the current report that we filed at the beginning of July. As we continue our hard work on the restatement, we are formulating our remediation plans for these issues simultaneously with the goal of emerging from these efforts as a stronger enterprise**.

As I mentioned earlier, I want to be completely clear that the company is not engaged in sub-prime or any other single family mortgage lending activities. The debt and equity financings that we arrange in the housing sector are strictly for multi-family rental properties, and our outlook for the multi-family rental sector is positive. And we do not own any CMBS or CDO securities. **We are pleased to have been able to announce our 42nd consecutive increase in the company's quarterly distribution**, and again we appreciate your support.

45.    On August 31, 2007, in a supplement to the Company's August 2, 2007 conference call, MuniMae filed with the SEC a Form 8-K which answered questions received by the Company from shareholders following the August 2, 2007 call.  Specifically, the Company made the following statements:

Q: Do you have exposure to the subprime lending market?

A: The company does not originate subprime or any other single family mortgages. The company does invest in highly rated (AA- or better by S&P) tax exempt bonds and interests in tax exempt bonds issued by state housing agencies to fund single family mortgage programs sponsored by the state agencies. These bonds are typically general obligations of the state housing agencies, which do not have taxing power but are typically rated entities and many of their bonds are insured by nationally recognized insurers of municipal bonds. The offering materials provided by the state agencies indicate that the single family loans they make with the proceeds of these bonds are long term fixed rate loans.

*Q: Does the company have exposure to the CDO market?*

*A: We said on our August 2, 2007 conference call that we do not own any CDO's. We do own two investments which are not described as CDO's in their offering materials, but which have many of the characteristics of a CDO. The debt instruments underlying these two investments are tax exempt revenue bonds issued by governmental agencies to finance a variety of government programs.* The instruments we own were rated AAA at issuance and we have not been notified of any rating change. These two investments comprise less than 1% of our assets.

The current market volatility may create buying opportunities for us and these opportunities may include CDO like instruments. We expect that any new investments will typically be tax exempt

highly rated government agency issues, including revenue bonds and interests in revenue bonds, but we would not rule out any opportunity we perceive to be unusually attractive.

Q: During the conference call, you mentioned that the bond default rate fell to 12% from 16% (of original issue amount) and that the watchlist bonds fell to 14% from 19% (also of original issue amount). Are watchlist bonds inclusive of the 12% that are already in default, or are 26% of the bond portfolio either in default or on watchlist?

A: Watchlist bonds (14% of original issue amount) are inclusive of the bonds in default (12% of original issue amount),  not  in addition to watchlist bonds.

Q: Can you provide a historical perspective on the longer term trend of these defaults?

A: As of the fourth quarter of 2004, defaults in the bond portfolio totaled approximately 12% of the portfolio. Defaults peaked at 16% of the portfolio in the second quarter of 2006 and were 12% as of the end of the second quarter of 2007.

*Q: How does the company view the credit risk and liquidity risk exposure on its private placement bond portfolio?*

*A: The credit risk associated with the company's private placement bond is largely dependent upon the performance of the each underlying multi-family housing property.  The recent performance of this portfolio has been stable and improving modestly.  Weighted average debt service coverage for the non-defaulted, stabilized portfolio remains at 1.14 as of June 30, 2007, consistent with June 30, 2006.  However, bonds in default and on our watch list, both in terms of number and as a percentage of the total portfolio, improved as of June 30, 2007 compared to one year earlier.*

*In addition, the composition of the bonds in the private placement portfolio has shifted over time to be more heavily weighted towards bonds associated tax credit equity.  We believe these bonds to be of higher credit quality than 501(c)(3) or 80/20 bonds.  As a result, we began to reduce our origination of 501(c)(3) bonds in 2001, and stopped altogether in 2003 Over time we also shifted toward bond deals in which there was tax credit equity. As a result, whereas at the end of 2000, 17% of our bonds were associated with tax credit equity transactions at June*

*30, 2007, 72% of our bonds were associated with tax credit equity transactions.*

Q: During the call you did not discuss occupancy trends in the tax exempt bond portfolio. Could you provide that information

A: The weighted occupancy rate in the company's tax exempt bond portfolio as of the end of the second quarter of 2007 was 91.8% compared with 91.5% as of the same date a year earlier.

Q: Does the recent market volatility affect the Company's business?

A: While we are not active lenders in the sectors that have given rise to recent market volatility, such market volatility can have unforeseen or unexpected effects in the financial markets generally, and we, like others,  could well be affected in ways we cannot predict. For example, volatility in one sector can lead to rising interest rate spreads in other sectors. Rising spreads typically cause the value of our fixed rate assets to decline. This can lead to margin calls on fixed rate assets we have financed, and in fact we have received, and met, margin calls associated with some of our financed assets, and we could receive additional margin calls. Another example is market liquidity. If banks and other capital providers decide to withdraw or reprice capital in the marketplace, our borrowing costs could rise or capital might become unavailable.

46.    On September 4, 2007, MuniMae filed with the SEC a Form 8-K, which disclosed, among other things, that the Company had received an extension from the NYSE through March 3, 2008 to file its Annual Report on Form 10-K for the 2006 fiscal year, and as such the Company's stock would continue to be listed on the exchange.

47.    Over the next few months, MuniMae announced several extensions of credit arrangements with lenders in which, as a result of the Company's delinquency in releasing its financial statements, the Company was forced to assume additional obligations, including increases to the Company's interest rate for borrowed funds, provision of additional collateral to secure existing obligations and the acceleration of repayment of the Company's outstanding debt.

48.    On November 8, 2007, the Company announced the appointment of defendant Kay as CFO, replacing defendant Pinckney, who retained his previous position of Chief Operating Officer. Specifically, in a press release entitled, "MuniMae Names Two Executives to Management Team," the Company stated, in relevant part:

> Mr. Kay will be joining MuniMae as Chief Financial Officer (CFO), a position most recently held on an interim basis by Chief Operating Officer (COO) Charles M. Pinckney. Mr. Pinckney, while relinquishing his acting CFO duties, remains as Chief Operating Officer. Prior to joining MuniMae, Mr. Kay was Co-Leader of the Financial Services practice of Navigant Consulting, Inc., a global consulting firm providing operational, dispute, investigative, risk management and financial advisory solutions to the market. Previous to this, he was CFO of J.E. Robert Companies which manages real estate funds investing in the United States and Europe. Prior to joining J.E. Robert, Mr. Kay was the Managing Partner of Arthur Andersen LLP's Mid-Atlantic accounting, audit and risk management services.
>
> "Having spent the last several months working on site at MuniMae, I look forward to taking on the role as the Company's CFO. I am excited about the Company's business model, the potential for growth and the opportunity to work with an excellent management team."
>
> Lisa Roberts, also of Navigant Consulting, will assume the newly created position of Senior Vice President, Business Unit Financial Operations for MuniMae. Prior to her most recent position as Managing Director of Navigant, Ms. Roberts was Vice President of Internal Financial Management for Freddie Mac.
>
> Kay and Roberts have been working in a leadership role with MuniMae over the recent months as part of the Navigant Consulting team assigned to the restatement process.
>
> "In working with both David and Lisa over the past several months on the restatement process we recognized that the integrity, talent, and leadership they demonstrated would be a significant asset to MuniMae's finance and accounting areas on a long-term basis," said Mike Falcone, President and Chief Executive Officer of MuniMae. "Their skills and professional background will be exceedingly valuable as we move forward."

49.     Also on November 8, 2007, certain of the Individual Defendants conducted a conference call.  The prepared remarks for this conference call, which had no question and answer session, were attached to a Form 8-K filed with the SEC on November 8, 2007 and state, in relevant part:

> **Mike Falcone**:
>
>                            \*       \*       \*
>
> Before we get into the review of each of our businesses, I would like to make three initial points. First, as the financial world continues to wrestle with a variety of factors including the ultimate impact on credit and financial markets of the ongoing repricing of risk and other economy-wide concerns, our businesses have been impacted in a variety of ways. Some of these are predictable, others are not. We are keeping a very close eye on both financial and real estate markets as we plan for 2008 and respond to the shifting environment in the fourth quarter. For us, the fourth quarter is usually a particularly busy and profitable quarter, as we typically generate roughly 40 – 60% of our annual revenue in the fourth quarter. Hence we must monitor the ongoing credit crisis very closely. As our team will describe in more detail shortly, **we are pleased with the levels of production across all of our business units through September 30 and remain positive in our outlook for the commercial real estate, affordable rental housing and clean energy sectors our businesses operate in.** Nonetheless, it is very difficult for us to predict how the broader issues in the economy will impact those sectors.
>
> Second, I should simply say again we are not in the single family lending business, nor in the subprime lending business.
>
> Third, I want to remind everyone what this call is, or rather is not. This is not an earnings call. Because of our pending restatement we cannot speak to earnings, only production. In that regard, we want to assure you that we are very focused on getting the restatement successfully completed. As an additional disclaimer regarding forward looking statements, the work that is being done to restate our financial statements could affect some of what we currently expect, as could a continuation or worsening of the current conditions in the capital markets.
>
> **As we have stated previously, assuming we can continue to execute on our capital plan and our business continues to**

*perform as we expect, management plans to ask the Board to maintain the current dividend policy, and in that regard, I am very pleased to reiterate what was previously announced that on November 1, our Board of Directors declared a distribution of $0.5250 per common share payable on November 21, 2007 to shareholders of record on November 9, 2007. This represents a $0.0175 per share or 3.45% increase over the distribution for the comparable period last year and is our 43rd consecutive increase in the quarterly distribution*. However, due to the costs being incurred by the Company in connection with the restatement the sum total of all of the dividends declared so far in 2007 represent a payout ratio in excess of the Company's net cash from operations through Q3 of this year. The final payout ratio for 2007 will, of course, not be known until year end but it is possible that the dividend payout ratio for the full fiscal year 2007 may exceed 100% of the Company's net cash from operations due to the costs being incurred by the Company from the restatement. Subject to my previous comments about uncertainty in markets today, we currently expect our business units to perform in the aggregate in line with our 2007 budgets. We hope upon completion of the restatement and normalization of our financial reporting situation to return to a more normal cost environment and to significantly improve our payout ratio. We are very proud of our more than 10 year history of consistent growth in cash distributions.

I will now move to a review of the highlights of our performance for the first three quarters of 2007, and after that Charlie will speak about our ongoing restatement effort. Following Charlie's presentation, Gary, Earl, Matt and Jenny will each speak briefly about the significant developments during the first three quarters of the year within their respective business units.

Overall our production for the first three quarters of the year exceeded our production for the first three quarters of 2006 . During the first three quarters of 2007, the dollar value of our total production across all business lines (which we'll break down in greater detail later) was approximately $2.8 billion, including approximately $483 million in production related to a business acquired during the period. During the first three quarters of 2006, the dollar value of our total production across all business lines was approximately $2.2 billion. Production in our affordable housing, commercial real estate finance and renewable energy finance businesses was up in comparison to last year, and Gary, Earl, Matt and Jenny will drill down further on 2007 performance metrics in a moment.

We are in constant contact with our capital partners and we have needed to ask them for extensions of deadlines. We expect this dialogue will continue until the restatement is completed. Some of our capital partners have granted waivers extending our November 30 audited financial statement delivery deadline and we are working with the others as deadlines approach. We have also had discussions with our capital partners about the impact of the broader credit market changes on our financing structures and continue to evaluate solutions to those issues as they arise. As we have mentioned in previous calls, there can be no assurance as to their future decisions.

The widening of spreads and other forces at work in the capital markets could have an impact on the valuation of assets on our balance sheet and we will be monitoring our assets accordingly. *Fortunately, as Earl will discuss, we chose at the end of last year to reduce our balance sheet holdings in our MMA Realty Capital group and in MMA Financial, so far, municipal bonds of the type in which we invest seem to be holding up in value fairly well*. We cannot of course predict what may happen in the future.

*        *        *

**Charlie Pinckney**:

Thanks, Mike. I want to take a few minutes to provide everyone with some reference points on our restatement progress as well as to provide an update on our expectations around the timing of filing our restated financials.

I have been working closely with the team from Navigant Consulting since our last update call and continue to believe that we are fortunate to have them on board to help us complete our restatement. Their track record with complex accounting and restatement issues continues to be an invaluable asset.

As Mike said, the major new development is that David Kay from Navigant has joined us as our new CFO. Dave brings a wealth of experience to the position and comes already knowing our company as a result of his time devoted to the restatement. While I will stay involved with the restatement until it is completed, Dave's arrival will eventually allow me to focus more time and effort on our overall operations. Prior to joining Navigant, where he served as co-leader of the Financial Services Practice, Dave was CFO at J.E. Robert Companies, a commercial finance and fund management company with operations across North America and Europe. Dave joined J.E. Robert after a 20 plus year career at

Arthur Andersen where he ended his tenure as Managing Partner of the Mid-Atlantic Accounting, Audit and Risk Management Services.

Also joining us from Navigant is Lisa Roberts who will be our Senior Vice President, Business Unit Financial Operations. Lisa most recently served as a Managing Director at Navigant. Prior to joining Navigant she spent 12 years at Freddie Mac, where she ended her tenure as Vice President of Internal Financial Management.

We continue to devote significant resources to our restatement task. We have over 100 FTEs working on the restatement including company employees and consultants all working extremely hard every day to complete this process. The obvious downside to these efforts is expense. Our budget for the year did not contemplate external resources of nearly this magnitude and the cost will be very significant for this year and well into next year.

*We are devoting as many resources as we can to getting this done as soon as we can, and we continue to try hard to finish our efforts and file our 2006 10K within the first two months of 2008*.

*We remain encouraged that we are moving well toward completion of the restatement and that MMA has taken key steps to building a new finance organization that will take us to the next level as a company*.

\*       \*       \*

*Gary Mentesana*:

Thanks, Charlie. As you may know, MMA Financial is responsible for all of the company's affordable housing finance, tax credit equity, tax-exempt bonds and taxable lending operations. We generate revenues through the origination, syndication, financing and management of debt and equity investments secured primarily by affordable multifamily housing projects.

During the first nine months of 2007, MMA Financial's total production, including both debt originations and equity placements, was $977 million, up somewhat from total production of $946 million during the same period in 2006:

- Debt originations during the period in 2007 totaled $355 million (which included $197 million in private placement bonds, $26 million in taxable construction loans and $132

million in taxable agency loans), as compared to approximately $247 million during the same period in 2006 (which included $182 million in private placement bonds, $27 million in taxable construction loans and $38 million in taxable agency loans).

- LIHTC equity syndications during the first nine months of 2007 totaled $398 million from 14 different capital partners. Of this amount, $183 million was syndicated through our guaranteed yield program. During the same period in 2006, approximately $481 million of equity was syndicated from 10 different capital partners, none of which was through our guaranteed program.

- The remaining $224 million of production through September 30 consisted of debt acquired within the Tender Option Bond (TOB) program as compared to $218 million during the same period in 2006 (however I should note that we began this program in April of 2006).

As I noted on our prior call, compared to prior periods, the debt business has experienced greater competition in 2007 resulting in lower origination fees and lower spreads over our cost of capital. However, we are benefiting from additional fees because a greater percentage of equity is being syndicated through our guaranteed yield program.

MMA Financial's production pipeline for the remainder of 2007 appears to be strong. Although we will continue to monitor the recent events within the capital markets that have the ability to impact our future production and profitability, we currently expect that the amount of equity we will syndicate this year will approach the amount syndicated in 2006 while the amount of debt that we expect to originate this year will materially exceed the volume originated in 2006.

*As for the credit quality within our $1.7 billion private placement bond portfolio, we have seen some meaningful improvement. Debt service coverage for the stabilized, fixed rate multifamily bonds in the portfolio remains stable at 1.14 as of September 30, 2007 (which is the same as the debt service coverage as of June 30, 2007 and up from 1.13 as of September 30, 2006). However, by original issue amount, bonds in default fell to 11% of the portfolio at September 30, 2007, down from 15% of the portfolio at September 30, 2006, and the bonds on our watch list fell to 15% of the portfolio at September 30, 2007, down from 17% of the portfolio at September 30, 2006.*

- 46 -

*       *       *

**_Earl Cole_**:

*       *       *

Today I want to tell you about the role of our group within MuniMae and how things have progressed in the first three quarters of 2007. It has been a rewarding year so far as disruptions in the capital markets this summer have validated our multi-year strategy of creating multiple origination platforms with diverse partners and driving the growth of recurring income.

MRC manages and directs most of the market rate real estate transactions pursued by MuniMae. We generally define these transactions as those that are not tax advantaged and do not generate tax credits or tax exempt income.

MRC conducts the majority of this activity through two primary business units of MRC, namely the Merchant Banking and Agency operations.

The Merchant Banking unit pursues debt and equity transactions on behalf of our investment partners as well as for our own account. In almost all situations we also act as asset managers, generating recurring income. These transactions cover a wide variety of investment types, from traditional commercial mortgages to B note and mezzanine debt investments. Underlying collateral can be virtually any commercial real estate type, from industrial and retail properties to office and multi family projects.

The other major segment of MRC, the Agency business, manages the multi family project debt that we originate and underwrite for sale to the government sponsored entities: Fannie Mae, Freddie Mac and Ginnie Mae. We make these loans and then resell them to these agencies after we ensure that they meet all Agency requirements. After the sale, we remain engaged as the loan servicer, for which we collect a fee.

Beginning in 2006 we began to better position MRC to respond to potential volatility in the US real estate markets. Specifically, we decided to reduce our reliance on transaction based income and establish a critical mass of recurring income in our investment management, asset management and servicing businesses. We began to shift our distribution focus to emphasize the efficient delivery of assets to our investment partners. This move both

reduced credit risk and built our recurring income. As a result, as our third party origination has grown, we have established a larger base of asset management income, which will continue to become more important over time.

Along with this targeted production and delivery focus, in early 2007 we also established new investment funds and expanded our base of investment partners. As a result, and unlike many others, we remain in the market and continue to originate and close loans.

This being said, we are not totally unaffected by the disruption in the real estate capital markets over the past few months. We have seen spreads on many transactions widen, putting pressure on the underlying deal economics and reducing the number of feasible projects that we can finance. At the same time, financing for transactions has been harder to come by, putting further pressure on our asset origination efforts.

Despite these challenges, MRC has continued to originate and close loans as we leverage our multiple origination channels and rely on numerous financing sources, some of which remain largely unaffected by the negative market forces referred to earlier. While we have seen a shift in our origination, we are still experiencing high volumes as evidenced as follows:

MRC generated gross loan production of $1.6 billion through the third quarter of 2007. Of this total, $1.12 billion in production came from the Merchant Banking business (including $483 million from a business we acquired at the beginning of 2007) and $476 million from the Agency business. Together, this production is an increase of 29% above the production seen through the third quarter of 2006.

Merchant Banking saw especially good results in third party originations, as assets originated on behalf of other investors totaled $619 million for the first three quarters, an increase of 187% over 2006. While this year's Agency production is 17% lower than production in the first three quarters of 2006, this is offset by the acquisition we made earlier this year and increases above 2006 levels elsewhere in MRC.

This high level of production would not be possible without the support of our capital partners. These include banks — who help us finance our investments through lines of credit and other debt facilities — and our investment partners — who purchase assets from us or fund them directly after we originate them.

Thus far in 2007 we have worked hard to increase the capacity and flexibility of our capital sources. In early 2007, we launched a new investment vehicle with a foreign pension fund that is already developing into one of our most promising new capital sources. Over the last ten months this fund has grown to become one of our most important sources of capital; by the end of this October, we expect to have delivered over $327 million in assets to this fund.

The net result of all of this activity is that we expect MRC to finish 2007 with higher production than that seen in 2006. While it is likely that some of our investment partners will pull back due to effects of the credit market turmoil on their availability of funds, we think the steps we have taken will substantially cushion the effects on us of those investor pull backs. Although the shift in origination sources will negatively impact margins on some assets, we will remain an active originator and maintain a steady presence in all of our markets by leveraging our multiple products and funding sources.

\*       \*       \*

**Mike Falcone**:

As I said earlier, we are pleased with our production performance so far in 2007. Based on experience, the fourth quarter is busier than the first three but our outlook remains cautiously positive as we move towards closing out 2007. Our success has been, as it almost always is, in large measure due to the hard work of our employees, their dedication to our shared values and the strong support we have received from our capital partners and developer clients. We will continue to work hard to make this business grow and prosper, and we appreciate your continued support as shareholders. Again, I'd like to assure you that we are very focused on getting the restatement successfully completed.

Even with less than 60 days left in the year, we have lots left to do. For us this is not so unusual. What is unusual is the highly volatile environment in which we now operate.

***We are pleased to have been able to announce our 43rd consecutive increase in the company's quarterly distribution***, and again we appreciate your support.

50.     Then, on December 13, 2007, the Company issued a press release entitled "MuniMae Provides Comment Regarding Stock Performance," which stated, in relevant part:

> Municipal Mortgage & Equity, LLC ("MuniMae," NYSE:MMA) has been asked by its shareholders to comment on the recent market activity of the Company's stock. Management of the Company is not aware of any pending transaction or event that might give rise to the recent volatility in the Company's stock price. In addition, management wants to reiterate that the Company is not engaged in sub-prime or any other single family mortgage lending activities.

51.     Then, on January 28, 2008, MuniMae announced that not only would the Company fail to meet the NYSE imposed deadline of March 3, 2008 for filing the Company's restated financial statements, which would result it the Company's stock being delisted from the exchange, the Company also would be forced to severely cut its quarterly dividend from $0.525 per share to $0.33 per share.  Specifically, in a press release entitled, "MuniMae Announces Quarterly Dividend; Provides Update on 2007 Production Numbers and on Restatement Process," the Company stated, in relevant part:

> Municipal Mortgage & Equity, LLC ("MuniMae" or "the Company," NYSE: MMA) announced today that its Board of Directors has declared a dividend distribution of $0.33 per common share payable on February 15, 2008 to shareholders of record as of February 5, 2008. The Company also announced that while it expects to have completed by the end of February, its substantive work required to prepare its 2006 financial statements and its restated audited financial statements for 2005 and 2004, the Company does not expect to be able to file its audited financial statements by its previously announced goal of March 3, 2008. Based on work done to date, the Company does not believe the results of the restatement will materially change the previously recorded cash balances of the Company and its subsidiaries.
>
> ***The reduction in the dividend distribution from $0.5250 to $0.33 per share is due to the cost of the Company's ongoing restatement of its financial statements***, the decision by the Company to conserve capital to protect the long-term prospects of the business given the current volatility in the credit and capital markets, and the desire to dedicate additional capital to the high-growth Renewable Energy Finance business, an increasingly important part of the Company's business. A portion of this dividend will be paid from sources other than cash generated from operations. The Board of Directors will continue to review the

Company's dividend payout on a quarterly basis based, among other factors, on the Company's net cash generation and the strategic needs of the business.

"Knowing the importance of the dividend to our shareholders, it was a difficult decision to reduce the dividend," stated Michael L. Falcone, Chief Executive Officer. "However, we believe that in this market it is important to be cautious in our approach to finding the balance between retaining capital to grow and to protect against uncertainty on the one hand, and distributing capital to shareholders as a dividend on the other. For 2007, our production numbers were solid, especially in our MMA Renewable Ventures unit which finished the year with a strong pipeline of additional solar and other renewable and clean energy opportunities. We believe the diversity of our various businesses helps us to succeed even in a tough marketplace. In these uncertain times, we will continue to be prudent in our management of the business, while remaining watchful for the opportunities that such markets usually present. We hope in the future to grow the dividend as we complete our restatement and as market conditions allow."

*       *       *

**Update on Restatement**

The Company also announced that it is filing with the Securities and Exchange Commission ("SEC") a Form 8-K, available at www.sec.gov , which discusses the nature of the changes in the Company's accounting policies that are being made as a result of the Company's ongoing restatement efforts covering its 2006 results. The overall impact of the restatement and the changes in the Company's accounting policies are still being quantified; however, the Company believes that the final result of the restatement will not materially change the previously recorded corporate cash balances of the Company and its subsidiaries. However, work on the restatement and the 2006 financial statements has not been completed and further work on the restatement or the audit of the 2006 financial statements could change these results.

The ultimate impact of the restatement is dependent on management finalizing all areas of the restatement and the completion of the external audit. ***Although the Company continues to work to file its restated financial statements at the earliest possible time, the Company does not expect to meet the previously announced March 3, 2008, New York Stock Exchange ("NYSE") deadline for filing its 2006 Form 10-K. As a result, the Company expects that the NYSE will suspend trading shortly and***

*commence delisting procedures. Upon suspension of trading on the NYSE, the Company's shares will begin to trade on the over the counter market pending a possible appeal and a final determination on the delisting.* If the Company is delisted from the NYSE, the Company will be able to apply for relisting on the NYSE when all its filings with the SEC are current.

*The Company currently expects to complete its unaudited financial statements for 2006 and its unaudited restated financial statements for 2005 and 2004 no later than mid-March 2008, and to file its Annual Report on Form 10-K for the year ended December 31, 2006, by May 30, 2008.* The delay in completing the restatement and filing the Form 10-K is not expected to have any impact on the issuance of K-1's to shareholders in time for inclusion in their 2007 tax returns.

52.     The Company attached the preceding press release to a Form 8-K filed with the SEC on February 29, 2008, which detailed the following changes in MuniMae's accounting policies:

- Inclusion in our consolidated financial statements of approximately 200 variable interest entities of which we are deemed the primary beneficiary even though we own only small minority equity interests. The impact of consolidating previously unconsolidated ventures results in a substantial increase in the total assets on our balance sheet, in which we have a minor ownership interest. The net income impact may be negatively affected by (i) inclusion of our share of losses of the consolidated entities, to the extent such losses are in excess of our general partner investments in those entities and (ii) inclusion of any amount by which the limited partners' shares of losses of consolidated entities exceeds their equity in those entities.

- Changes in the way we recognize revenue for our low income housing tax credit business, the largest impact of which is the deferral of revenue (syndication fees and asset management fees) related to guaranteed funds. In addition, the consolidation of these entities results in our eliminating asset management and guarantee fees, which we previously had recognized as a separate revenue item, and reflecting them instead as a component of the net income that results from the consolidation of these funds.

- Changes in the way we account for loans, including the fair value of our held-for-sale loans we used in determining the lower of cost or market value of these loans, changes in the way we determine which held-for-investment loans are impaired and the amount of the impairment, and changes in the recognition of loan origination costs.

- Changes with respect to our accounting for derivatives, including recognizing additional types of contracts as derivatives that must be marked to market, and other changes that affect the timing of profit and loss recognition.

- Recognition of additional guarantee obligations as liabilities and changing the way some recourse obligations are amortized to income.

- Changes to the estimated fair values of some of our bonds, derivatives, mortgage servicing rights and guarantee obligations, including increasing the value of some servicing rights we obtained through acquisitions or retained when loans were sold, which reduces the future income we will recognize with regard to those servicing rights.

- Other changes in accounting relating to bonds, mortgage servicing rights, equity investments, equipment, leases, including changes to the amortization and depreciation with regard to certain assets. In addition, we corrected our purchase accounting on some acquisitions, determination of our share of earnings and losses on investments accounted for under the equity method, and manner and timing of recognition of expenses with regard to share based compensation awards (none of which involved option backdating).

- Because neither the restatement nor the audit of our restated financial statements has been completed, it is possible that there will be additional changes as a result of the restatement. The changes as a result of the restatement will affect our financial statements for the year ended December 31, 2006 and subsequent years, as well as the financial statements that are being restated.

53.   Also on January 29, 2008, before the trading markets opened, MuniMae and certain of the Individual Defendants conducted a conference call. A transcript of that call was

attached to the Company's Form 8-K filed with the SEC on January 30, 2008, and stated, in relevant part:

> **Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*
>
> *     *     *
>
> Our Board of Directors has declared a quarterly dividend distribution of $0.33 per common share payable on February 15, 2008 to shareholders of record as of February 5, 2008. ***This is approximately 37% less than the $0.525 quarterly dividend the Company paid in November of 2007. The reduction in the dividend distribution is due to the cost of the Company's ongoing restatement of its financial statements***, the decision by the Company to conserve capital to protect the long-term prospects of the business given the current volatility in the credit and capital markets and the desire to dedicate additional capital to the high-growth renewable energy finance business, an increasingly important part of our business.
>
> A portion of this dividend will be paid from sources other than cash generated from operations. Our Board of Directors will continue to review the dividend payout quarterly based, among other factors, on our net cash generation and the strategic needs of the business.
>
> It was a difficult decision to reduce our distribution as we know the importance of the dividend to our shareholder base. However, we believe that in this market environment it is prudent to be cautious in our approach to managing cash, balancing between retaining capital to grow and to protect against uncertainty on the one hand and distributing capital to shareholders as a dividend on the other. Over time we hope to grow the dividend as we complete the restatement and as market conditions improve.
>
> *     *     *
>
> **David Kay** - *Municipal Mortgage & Equity LLC — CFO*
>
> *     *     *
>
> The overall impact of the restatement and the changes in our accounting policies are still being quantified. However, we believe that the final result of the restatement will not materially change our previously recorded corporate cash balances. The ultimate impact of the restatement is dependent on management finalizing

all areas of the restatement in the completion of the external audit.

Although we continue to work to file our restated financial statements at the earliest possible time, we do not expect to meet the previously announced March 3, 2008 New York Stock Exchange deadline for filing our 2006 Form 10-K. As a result we will expect that the New York Stock Exchange will commence delisting procedures and suspend trading shortly. Upon suspension of trading on the New York Stock Exchange our shares will begin to trade on the over-the-counter market pending a possible appeal and a final determination on the delisting. If we are delisting from the New York Stock Exchange we will be able to apply for relisting when all of our filings with the SEC are current.

***We currently expect to have management prepared unaudited financial statements in compliance with GAAP for 2006 and unaudited restated financial statements for 2005 and 2004 no later than mid-March 2008. We will then file our annual report on Form 10-K for the year ended December 31, 2006 by May 30, 2008***.

In terms of our progress on the restatement, on the accounting policy front we have virtually completed our analysis of all of our accounting policy changes. As mentioned before, the overall corporate cash balances are not changing significantly; however the timing of the income and expense recognition related to some of our business transactions is changing as a result of the restatement.

For example, we are now consolidating all of the funds related to our tax credit equity business; we are deferring syndication and asset management fee income due to our guarantees on certain of these funds; and we have changes related to the recognition of costs and fees associated with our lending businesses. You can refer to our recently filed 8-K for a more comprehensive description of our accounting policy changes.

We are almost finished with the remeasurement aspect of the restatement; however until management finalizes its financial statements and the external audit is complete the expected outcome of both the nature of the restatement adjustments and the timing of the filing of the Form 10-K for 2006 cannot be known with certainty.

We continue to devote significant resources to our restatement task. We have over 100 employees and consultants working extremely hard every day to complete this restatement. As we have

discussed in the past and as Mike touched on in his summary of the Board's decision regarding our dividend, the obvious downside to these efforts is expense. Our 2007 budget did not contemplate external resources of nearly this magnitude and the cost will continue into 2008.

*       *       *

**Gary Mentesana** - *Municipal Mortgage & Equity LLC — EVP, Head of MMA Financial*

*       *       *

***For the year ended December 31, 2007 MMA Financial's total production, including both debt originations and equity placements, was $1.7 billion, down approximately 10% from the total production of $1.9 billion for the year ended December 31, 2006.*** Debt originations for 2007 totaled $636 million which included $296 million in private placement bonds, $115 million in taxable construction loans and $225 million in taxable agency loans, as compared to approximately $392 million for 2006 which included $267 million in private placement bonds, $53 million in taxable construction loans and $72 million in taxable agency loans.

*       *       *

***As for the credit quality within our $1.7 billion private placement bond portfolio, we experienced a reduction in the debt service coverage as four highly performing bonds were redeemed for significant gains at the end of the year.*** But we continue to see meaningful improvement in the bonds that are in default and on our launch list. Debt service coverage for the stabilized fixed-rate multi-family bonds within the portfolio was 1.12 as of December 31, 2007 which is down from 1.14 as of September 30th and from 1.13 as of December 31, 2006.

By original issue amount bonds in default fell to 10% of the portfolio at December 31, 2007, down from 15% of the portfolio at December 31, 2006. And the bonds in our watchlist fell to 12% of the portfolio at December 31, 2007, down from 17% of the portfolio at December 31, 2006. At this point in time I'll turn the call over to Earl Cole for an update on our MRC business.

*       *       *

**Josh Peters** - *Morningstar — Analyst*

Good morning. Looking at the line where you refer to the dividend

needing in part to come from sources other than cash flow in the first quarter, is this a matter of seasonal timing in your earnings plus the cost of the restatement or are you going to be running at a pay out ratio for the full year that might be over 100%?

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

We obviously can't fully speak to cash flows and expectations, but if you look at the seasonal timing and the restatement together that accounts for the majority of the reasons for that sentence being in there.

**Josh Peters** - *Morningstar — Analyst*

So you can't give much of an outlook about the remainder of the year?

**David Kay** - *Municipal Mortgage & Equity LLC — CFO*

Not at this point.

**Josh Peters** - *Morningstar — Analyst*

Is it fair to say that the projections that you have made internally, that that's been what the Board has decided to set the new dividend rate at going forward?

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

Correct, we actually had a Board meeting that started on Thursday, we began a discussion of the topic, we adjourned that Board meeting, provided additional information to the Board in a Board meeting yesterday and concluded, based on the information that we had, that the right thing to do was to make the cut in the dividend that we proposed.

I should say that we've talked about three factors here — it's really no one factor but really the combination of all three factors that has led to this decision. So it's hard to speculate if there were only one factor would you have done it? But really it is the combination of the three right now that has led to the decision.

**Josh Peters** - *Morningstar — Analyst*

Okay. I know this is going to be kind of a numbers question, but can you give us any information about available liquidity over the

next couple of quarters? If you are going to be paying out a dividend that's in excess of cash flow potentially in the first quarter, you've got enough access to capital to support that, can you put any numbers around that?

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

Let me describe the process that we went through with the Board to make this decision. We looked at our starting liquidity availability, we looked at all of the sources and uses of capital that we would imagine needing to run our business and pay for the restatement over the course of the year, looked at that on a quarterly basis and used that in making our judgment that the smaller dividend would be prudent.

**Josh Peters** - *Morningstar — Analyst*

*Okay. Well, moving on to the restatement process, that's another numbers question, can you quantify the cost of the restatement thus far?*

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

*We knew that this was going to be one of the key questions that folks were going to ask today and we really can't answer that question. It has been substantial and we look forward as we wrap-up the restatement in the coming months to be able to speak to that.*

**Josh Peters** - *Morningstar — Analyst*

Okay. And then assuming that you can hit this mid-March target for having unaudited financial statements — first, are you planning to release those figures when they're available or are you going to wait until they're audited and you're actually filing the 2006 10-K at the end of May?

\*     \*     \*

**Josh Peters** - *Morningstar — Analyst*

Okay. And then now that you're going to have to be consolidating all of these entities into the future are you looking at an accounting cost for the business going forward that's going to be much higher than it had been in the past when you didn't have to consolidate these entities?

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

In the short-term the answer to that is, yes. Our plan is to move to automate as much of this consolidation as we can in relatively short order. But in the short-term we will need to throw some bodies at that to accomplish the accounting.

**Josh Peters** - *Morningstar — Analyst*

Okay. And can you give us any idea of how fast you'll be able to run through your 2007 quarters? Do you expect that you can become fully caught up at some point during 2008? I know it's kind of a moving target unfortunately, but I'd appreciate some guidance on that.

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

We just had a little legal consult here, Josh, I'm sorry. We have a variety of options for finishing up the catch-up process. We could file '07 alone, we can file '07 and '08 together when we file '08. So right now we're not really in a position where we can answer that question.

**Josh Peters** - *Morningstar — Analyst*

Okay, but you seem to be saying that it could be all the way through into early 2009 before we get 2007 information.

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

It could be to that time frame by the time you get audited 2007 financial information. We're going to look to provide information to our capital partners and others earlier in the year and we'll see which of that we can parse out and deliver publicly and maybe do the 8-K kind of filing for 2007 as soon as we can do it. But it won't — the odds of the — the audited 2007 will not come before late in the year.

\*        \*        \*

**Josh Peters** - *Morningstar — Analyst*

Okay. I also want to talk about the potential for future dividend growth which you do mention in your press release. It seems to be contingent on the progress of the restatement process as well as

some of the turbulence in the capital markets clearing up. Is it fair to say that you probably won't be looking to raise the dividend before you're fully caught up on your financial filings?

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

I'm not sure I can answer that question directly, Josh, because we didn't talk about it at that level of detail at the Board. But I can tell you this exact sentence, "over time we hope to grow the dividend as we complete the restatement and as market conditions improve," was discussed at my request at the Board meeting because I wanted to give folks clear indication of our sense of what we want to do with the dividend in the future. We can't be more specific than we've been here, but I think that it's a fairly good statement of our intent.

**Josh Peters** - *Morningstar — Analyst*

Okay. I guess the part of the sentence that I'm looking at is "as we complete", which might imply as you continue to make progress as opposed to saying when the restatement is completed. So I guess I'm looking to do some parsing of my own and see if you can give me a little additional clarity.

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

I'm getting the nod here or the shake. I really can't be more specific than this sentence. This sentence is definitively what the Board talked about and approved.

**Josh Peters** - *Morningstar — Analyst*

Okay. And looking forward, would you be looking to try and take the dividend rate back to where it was prior to this cut as soon as possible once you are in a position to grow the dividend again? Or are we going to be looking at your old 2 to 4% type of growth rate off of this new base?

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

I'm going to be evasive again which I really don't like, but the sentence here that we have gotten approved at the Board says "over time we hope to grow the dividend as we complete the restatement and as market conditions improve". I guess I could say that if you were to do the math and look at the way the business

works previously in terms of the relatively high payout ratios we've had and you look at the dividend cut we're making today you could do the math and conclude that once we "return to normal" that there should be significant cash generation above the dividend.

What the Board will decide to do with that cash at that point is embodied in this sentence right now. But I think there will be the opportunity, if markets recover in the way we expect them to, if our business develops in the way we expect it to I think we do have the opportunity to grow that — we would have the opportunity to grow the dividend faster, but the Board has made no commitment to do that and it will be a decision that we make in the future as we see what the competing needs are and what the market conditions are. We say the Board will continue to review the dividend based, among other factors, our net cash generation and the strategic needs of the business.

*     *     *

**James Sterling** - *A.G. Edwards — Analyst*

***Good morning, gentlemen. I guess I just have two questions if I may, and I'm approaching this more from a person who just manages other folks' money on their behalf, so it's a little bit from a layman's perspective. The one thing that I'm a little bit befuddled on is from your statements of two months ago you actually maintained your high-level of a dividend and I think actually increased it just very modestly in that last time frame. And so your statements today either illuminate that there was a substantial change in the marketplace over the last couple of months since that last statement or that you were unaware of the level of deterioration that had already taken place in the October/November time frame. I was just hoping first off if you could illuminate the change in your posture over the last two or three months regarding that?***

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

Sure. They really are twofold. I think it was pretty predictable for us two or three months ago that we were going to need some additional working capital and long-term capital for the renewable energy business because the growth of that business last year and the projected growth this year; that was very predictable. What has changed in the last two months is really the first two elements of the three.

*We had expected, obviously until very, very recently, to be wrapping up the restatement in a matter of a couple of weeks, several weeks here in terms of the active work we had to do and then turning it over to the auditor. So it's the length of time that we will be spending on the restatement changes our views of what — or the increased length of time changes our view of what's going on in the cost side of the equation.*

And two, this market in terms of what's going on in the capital and credit markets I think — and in the third quarter, beginning of the fourth quarter we were beginning to feel like there was a recovery going on a little bit. Some of the spread indicators we might look at like CMBS which gives some sense of capital flowing into the real estate market — some of that stuff had gotten better about the time we made the dividend decision last time and we were thinking that the worst was behind us.

At this point I think what we're saying is we don't know if the worst is behind us and we need to be cautious with our shareholders' capital as we go forward. And that's probably the big change in our view over the last two or three months.

**James Sterling** - *A.G. Edwards — Analyst*

*Okay. And the second question for you is just — it's very difficult for me, and if it's difficult for me I'm sure for the majority of the individual investors that are out there it's got to be very difficult for them to just understand the complexity of your financial restatements and why there's been multiple points where you've delayed it. And I'm just hoping that there's some way that you can sort of elaborate on that a little bit for us to help us understand the complexity and why it keeps getting pushed back as it has been?*

\*       \*       \*

**David Kay** - *Municipal Mortgage & Equity LLC — CFO*

James, the complexity is huge and I kind of live it every day. And just to kind of give you and others a sense for it — *probably the biggest area that's creating the most impact and time frame to get this done is this implementation of FIN 46 which revolves all-around consolidation accounting.*

We have so many different investments, significant ones through the LIHTC funds as well as other activities within the business. *We had to analyze probably over 200 entities to determine consolidation or not.* And at the end of the day on the Lytec side

we're consolidating these entities. And we had no process really to do that before.

So you've got to basically build a process and implement it and do it — we're doing it really for three years which includes 10 periods. And a lot of this has to go back to look at the accounting before '03 in order to get the beginning balances right. So that's just one example where there's a significant amount of work. The other is we're consolidating properties where we've reassigned the GP interest. Again, we had no process to take care of that so that's a highly manual intensive rework to get that done. And as we go forward we'll automate that.

But the fact of the matter is to go through the complexity of the accounting and get that cleared with our external auditor, then to go through and do the remeasurement takes a significant amount of time. And quite frankly, we did change auditors over a year ago. They're looking through the three-year period and a substantial amount of the work is to prepare audit packages for them to basically get through the audit. So everything is being examined by them; there's no reliance, if you will, on the previous auditor's work.

So that in and of itself, even in areas where there's no restatements or remeasurement being done we have to do a significant amount of work to put together packages. So it is significant and it has made this time frame slip. We do feel that we're in relatively good shape to get the management financials done in that mid-March frame and then we're working side-by-side with the external auditor to get them through the audit and hope, as I said, we want to file as soon as possible and we hope it's before May 30th, but we're putting that out there as the outside date just a give investors some type of time frame.

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

James, just to put a number on that for a minute, if you look at the number of real estate partnerships that we had in — that we're now consolidating that we weren't set up to previously consolidate, there's more than 2,000 real estate partnerships that we will consolidate where we're a general partner with a 0.01% interest. And we have to do the accounting for that over, as Dave said, 10 periods. So it's 6,000 separate financial statements that has to go back and be done.

*          *          *

**Bob Peters**

I appreciate the call. I wanted to get back to something the other gentlemen had mentioned. On the last dividend you've raised it modestly and you had said this was not an earnings call, it was a production call. And based on production and, as I was led to understand, cash flow there was room to raise that dividend. So I have two questions.

One is, again have things changed that drastically in the last few months? I think you answered that in part. And the second question is you indicated that this new lowered dividend rate is not going to be paid from production but is also going to be paid from some working capital and if you could expand on the relative components of that dividend it will I hope clarify your ability to maintain it. Which is really another way of saying how long can you keep paying it before you make damaging incursions into your working capital?

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

Bob, I'm afraid I can't answer that as fully as you would like. I can go back to the process that the Board went through which was looked at our expectations around sources and uses of capital over the 12-month period in front of us. And I can tell you that an important element of the discussion was we wanted to find a place where we thought we could do — where we would only have to do this once. But there's nothing about that that can be an assurance that our projections and our expectations about the market going forward are going to come true.

Fundamentally we I think in the second bullet around the decision, we are a little nervous about going on in the marketplace right now. We just — I think in November — was it November when we declared the dividend? October — we had a sense that the bottom being down in the market and as we sit here today we're not nearly as confident that we're near the bottom as we were three or four months ago.

And you can see all of the activities that have gone on that made us nervous. It's the subprime losses that folks are taking and I should say we're not, again, we're not in the subprime business, but all of those losses that folks are taking — the collapse of the commercial paper market in Canada, the collapse of the SIV market in London, the sort of global flows of capital are quite constrained.

We are hopeful that the actions by the Fed last week and whatever they may do today will start to reopen the channels with the banks in terms of desire to take on credit and make investments and that that will really support prices in the real estate market outside of the home market. We've seen some modest change in real estate values (technical difficulty) for commercial and the underlying performance of those properties would indicate values should be pretty steady.

So there's a change in capital markets will change values around capitalization rates or price times earnings ratios is something that we have become much more conscious about in the intervening three months, and that's four months and that's why we've made this change today.

**Bob Peters**

Let me ask the question a different way in terms of the dividend where it is now. Assuming that your distributable cash flow that you don't want to allocate to the other businesses does not improve, do you have any time frame for how long you can keep this dividend rate?

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

I'm afraid I'm getting the wave here. I can't predict the future. I can tell you the process that the Board went through, what they looked at and how they made this decision. We will change our expense profile dramatically when we get the restatement behind us in that.

**Bob Peters**

I look forward to it.

**Mike Falcone** - *Municipal Mortgage & Equity LLC — CEO, President*

As do we.

54.    Following these revelations, MuniMae's stock price collapsed, plummeting from a closing price of $17.20 on January 28, 2008 to close at $9.19 on January 29, 2008 – a decline of 47%.  Moreover the Company's stock price declined by more than 65% between the Company's announcement of the second restatement on September 14, 2006 and the Company's

late January 2008 announcements.  This precipitous drop was due, at least in part, to the Company's continual failure to complete the restatement process in a timely manner while continually announcing additional material deficiencies in the Company's financial accounting and disclosure controls and procedures.

55.     On March 3, 2008, MuniMae filed with the SEC a Form 15-NSE acknowledging that the NYSE would remove the Company's stock from listing and registration on the exchange effective March 13, 2008 for the Company's failure to file timely financial reports.

56.     Finally on April 9, 2008, MuniMae filed with the SEC a Form 8-K disclosing preliminary unaudited results of the restatement.  As a result of the Company's incorrect accounting treatment of numerous issues, shareholder equity for the fiscal year ended December 31, 2005 *was reduced by $44.9 million*.  In the April 8, 2008 8-K, MuniMae made the following statements regarding the Company's accounting corrections:

> The restatement process has changed our previous accounting across many areas of our activities. However, it has not resulted in any significant adjustments to our corporate cash accounts. The restatement did affect three areas more than others. Those three areas, and their effects as compared to our previously reported December 31, 2005 financial statements, are as follows:
>
> - *We have consolidated over 230 entities, in which we have little to no ownership interest, that were not previously consolidated. The consolidation of these entities resulted in our including in our total assets as of December 31, 2005 approximately $4.6 billion of assets in which we had little or no economic interest and including in our total liabilities at that date $1.9 billion of liabilities as to which neither we nor any of our majority owned subsidiaries have any obligations as well as $2.7 billion of non-controlling interests in consolidated funds and ventures. It also resulted in our recording cumulative losses of $78.3 million* (primarily the result of property depreciation charges), which we have no financial obligation to fund. To the extent these charges are attributable to consolidation, we expect these charges to reverse upon disposition of the entity. Our only economic interest in these entities is

through bonds and loans secured by these properties, which had an asset value of $154.0 million at December 31, 2005.

- ***We made significant changes in accounting policies related to tax credit equity funds sponsored by our Affordable Housing Division. These changes resulted in an overall reduction of Shareholders' Equity totaling $55.2 million at December 31, 2005***. The three largest components of this reduction involved the deferral of syndication fees that were not previously deferred, the expensing of start-up costs that were previously capitalized and the remeasurement of recorded losses related to the real estate sale aspect of our syndication activities. These reductions were slightly offset by positive impacts of changes to our asset management fee recognition policy.

- We made numerous changes to the valuation of financial instruments including valuations of the Company's bond portfolio, loans, derivatives, mortgage servicing rights, and certain guarantee obligations, resulting in an overall net increase of Shareholders' Equity totaling $78.8 million at December 31, 2005. The majority of this change is directly attributable to the revaluation of the bond portfolio, which resulted in an increase in the carrying value of such bonds of $67.7 million. ***This positive valuation impact relates to values at December 31, 2005. Market changes in 2008 have resulted in substantial adverse changes to the values of our tax-exempt bonds.***

57.     Moreover, MuniMae disclosed that in 2007 alone, the Company ***spent more than $54.1 million for costs related to the restatement***.   As of the filing of this Complaint, MuniMae's stock has been trading over the counter at an approximate price of $4.00, down more than 87% from the stock's high closing price during the relevant period of $32.20 per share on December 29, 2006.

## THE INDIVIDUAL DEFENDANTS' BREACHES OF THEIR FIDUCIARY DUTIES

58.   Since 2002, the Company, with the knowledge, approval, and/or acquiescence of the Individual Defendants, regularly and systematically violated GAAP by materially misstating or overstating, among other things, the following:

a.      Real estate syndication fees;

b.      Impairments of investments in real estate partnerships held by guaranteed tax credit equity funds;

c.      Consolidated tax credit equity funds;

d.      Capitalized interest costs associated with investments in real estate partnerships;

e.      Deferral and recognition of bond and loan origination fees and direct costs;

f.      Investments in partnerships under the equity method of accounting;

g.      Income taxes;

h.      Employee benefits;

i.      Accrued Expenses;

j.      Consolidation of variable interest entities;

k.      Tax credit equity fund start-up costs; and

l.      Costs of acquiring investments in partnerships.

59.    Since 2002 the Individual Defendants received numerous reports regarding problems with MuniMae's accounting and financial reporting practices and internal controls. Through their receipt of weekly, monthly, and quarterly reports; attendance at Board and Audit Committee meetings; review of the Company's financial statements; and conversations with the Company's management, internal auditors, and external auditors, the Individual Defendants knew that MuniMae's accounting and financial reporting practices were improper and its internal controls were materially deficient. In breach of both their fiduciary duty of good faith and, with respect to defendants Baum, Brown, Hillman, Mehlman and Pratt and Pratt, their responsibilities pursuant to the Audit Committee Charter, the Individual Defendants willfully ignored the sustained and systematic failure of MuniMae's accounting and financial

reporting practices and procedures and internal controls, and failed to make a good faith effort to correct the problems or prevent their recurrence.

60.    From and including 2003 until 2006, the Company, with the knowledge, approval, and participation of each of the Individual Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

a.    Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 27, 2003 and signed by defendants Joseph, Falcone, Harrison, Baum, Berndt, Hillman, and McGregor;

b.    Form 10-K for the fiscal year ended December 31, 2003, filed with the SEC on March 12, 2004 and signed by defendants Joseph, Falcone, Harrison, Baum, Berndt, Brown, Hillman, Pratt and McGregor;

c.    Form 10-K for the fiscal year ended December 31, 2004, filed with the SEC on March 16, 2005 and signed by defendants Joseph, Falcone, Harrison, Baum, Berndt, Brown, Hillman, Pratt, Mehlman and McGregor; and

d.    Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on June 22, 2006 and signed by defendants Joseph, Falcone, Lundquist, Baum, Berndt, Brown, Lucas, Hillman, Pratt, Mehlman and McGregor.

61.    Furthermore, the Individual Defendants failed to act in good faith to implement appropriate remedial measures to cure the known material deficiencies in the Company's internal controls, ignoring the sustained and systematic failure in MuniMae's accounting and internal control practices and procedures and failing to make a good faith effort to correct the problems or prevent their recurrence.  Specifically, the Individual Defendants, despite recognizing that the Company's need for additional qualified accounting personnel, at least as early as 2004, had still failed to hire adequate numbers of trained personnel following the Company's initial restatement in June 2006 – *more than two years later*.  Additionally, as of June 22, 2006, the Individual Defendants were "continuing [to implement remedial] efforts in 2006" in the following areas, among others: (i) establishing a group dedicated to improving the use of technology to automate

analyses, provide direct interfaces from subsidiary systems, and aggregate and process transactions; (ii) developing accounting models related to the Company's business activities to train the accounting staff to reduce errors; (iii) developing standard reporting for each of the Company's business units; and (iv) establishing and documenting formal accounting policies. Effectively, this declaration by the Company acknowledges that despite knowledge of the Company's sustained and systematic failure of its internal controls over a multi-year period, the Individual Defendants had still failed in good faith to implement adequate internal controls even after the Company had been forced to restate its financial statements for the first time in 2006. By the time the Individual Defendants finally attempted to cure the deficiencies in the Company's internal controls it was far too late, and cost the Company tens of millions of dollars.

62.     The Individual Defendants breached their fiduciary duties of loyalty and good faith by knowingly disseminating false information about the financial condition of the Company, which resulted in injury to the Company.  Furthermore, the Individual Defendants knowingly failed to implement adequate internal accounting and disclosure controls and procedures, and then failed to make a good faith effort to cure the admitted deficiencies in the Company's internal controls and procedures.  As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, including, but not limited to, the substantial costs and expenses in connection with the Company's restatement of its financial statements, the delisting of the Company's stock from the NYSE and the SEC inquiry.

## **DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

63.     Plaintiff brings this action derivatively in the right and for the benefit of MuniMae to redress breaches of fiduciary duties, unjust enrichment, and other violations of law by the

Individual Defendants.

64.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

65.     Plaintiff is a shareholder of MuniMae, was a shareholder of MuniMae at the time of the wrongdoing alleged herein, and has been a shareholder of MuniMae continuously since that time.

66.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action.  MuniMae's Board is currently composed of ten (10) directors, defendants Joseph, Falcone, Baum, Berndt, Lucas, Brown, McGregor, Mehlman, Hillman and Pratt.  A demand on the Board would be a futile and useless act because the entire Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

67.     As demonstrated herein, defendants Joseph, Falcone, Baum, Berndt, Lucas, Brown, McGregor, Mehlman, Hillman and Pratt knowingly failed to implement adequate internal controls and procedures in spite of numerous "red-flags" that the Company's internal controls were deficient, resulting in a sustained and systematic failure by the Company to properly account for and disclose the Company's financial practices.  Thus the entire Board failed to act in the face of known duties, and consciously failed to comply with applicable accounting regulations, which has caused the Company to suffer severe damages and subjected the Company to substantial liability.

68.     The "red-flags" which were knowingly ignored by defendants Joseph, Falcone, Baum, Berndt, Lucas, Brown, McGregor, Mehlman, Hillman and Pratt include:

>    A.     According to the Company's 2005 Form 10-K, at least as early as 2004, the Individual Defendants admittedly recognized that the Company lacked

a sufficient pool of qualified accounting personnel;

B.    From 2002 to at least 2005, the Individual Defendants knew that they had failed to maintain and disseminate sufficient accounting guidance to the Company's employees despite the requisite level of sophistication necessary to account for the Company's financial transactions;

C.    From 2002 to at least 2005, the Individual Defendants knew that the controls in place regarding the physical entry of financial transactions and resulting journal entries into the Company's ledger systems were manually intensive, uncoordinated and did not provide for adequate error prevention or detection;

D.    The Company's initial restatement of its historical financial statements announced in March 2006;

E.    The Company's admission that there were seven separate material deficiencies in the Company's internal controls and procedures as disclosed in the Company's 2005 Form 10-K;

F.    The shareholder derivative action alleging improper accounting practices and internal control deficiencies filed in the Delaware Court of Chancery in September 2006, styled *Wood v. Baum et al.*, C.A. No. 2404-VCL;

G.    The dismissal of the Company's independent registered public accountant in October 2006;

H.    The resignation of defendant Lundquist, the Company's Chief Financial Officer; and

I.    The mounting cost of the Company's restatement that was exerting significant pressure on the Company's working capital, which would inevitably influence the Company's determination to distribute its quarterly dividend.

69.    Defendants Joseph, Falcone, Baum, Berndt, Lucas, Brown, McGregor, Mehlman, Hillman and Pratt are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

a.    In light of their knowledge of the Company's sustained and systematic failure to implement proper accounting and disclosure practices, defendants Joseph, Falcone, Baum, Berndt, Lucas, Brown, McGregor, Mehlman, Hillman and Pratt breached their fiduciary duties by failing to make a good faith effort to correct the problems or prevent their recurrence, and knowingly disseminating to MuniMae shareholders materially false and misleading information regarding the Company and

its financial results, as alleged herein.  Defendants Joseph, Falcone, Baum, Berndt, Lucas, Brown, McGregor, Mehlman, Hillman each face a substantial likelihood of being held liable for breaching their fiduciary duties, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

b.      In light of their knowledge of the Company's sustained and systematic failure to implement proper accounting and disclosure practices, defendants Baum, Brown, Hillman, Mehlman and Pratt, as members of the Audit Committee at relevant times hereto, breached their fiduciary duties by failing to ensure the integrity of the Company's internal financial and disclosure controls and procedures and then failing to make a good faith effort to correct the problems or prevent their recurrence, and knowingly disseminating to MuniMae shareholders materially false and misleading information regarding the Company and its financial results, as alleged herein.  Defendants Baum, Brown, Hillman, Mehlman and Pratt each face a substantial likelihood of being held liable for breaching their fiduciary duties, and therefore are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action; and

c.      The principal professional occupation of defendant Falcone is his employment as Chief Executive Officer of the Company, pursuant to which, under his recently executed employment agreement, he will receive $500,000 per year in salary alone, and likely will receive hundreds of thousands of dollars in bonuses and other compensation annually. Accordingly, Falcone is incapable of independently and disinterestedly considering a demand to commence this action against the other members of the Board, and specifically Compensation Committee members Baum, Hillman, Lucas and McGregor, who control his employment and compensation.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY
### OF GOOD FAITH
### (ACCOUNTING AND INTERNAL CONTROLS)

70.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

71.     As alleged in detail herein, each of the Individual Defendants had a duty to, inter alia, exercise good faith to ensure that the Company was operated in a diligent, honest and

prudent manner and, when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence.

72.     As alleged in detail herein, the Individual Defendants willfully ignored the obvious and pervasive problems with MuniMae's accounting and internal control practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

73.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages, as alleged herein.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY OF GOOD FAITH (DISSEMINATION OF FALSE AND MISLEADING INFORMATION)

74.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

75.     As alleged in detail herein, each of the Individual Defendants had a duty to, inter alia, exercise good faith in supervising the preparation and filing of all financial statements and other financial information required by law, including periodic financial statements and reports filed with the SEC.

76.     As alleged in detail herein, the Individual Defendants breached their fiduciary duty of good faith by knowingly disseminating to MuniMae shareholders, in MuniMae's SEC filings and otherwise, materially false and misleading information regarding the Company and its financial results.

77.    As a direct and proximate result of the Individual Defendants' foregoing breaches

of fiduciary duties, the Company has sustained damages, as alleged herein.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding the Company the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Granting appropriate equitable relief to remedy defendants' breaches of fiduciary duties;

C.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 14, 2008

Patrick C. Smith (Bar No. 02054)
Michael A. Stodghill (Bar No. 25295)
POWERS & FROST, LLP
502 Washington Ave., Suite 200
Towson, Maryland 21204
(443) 279-9700
(443) 279-9704 (fax)

*Attorneys for Plaintiff*

Of Counsel:

**SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP**
Eric L. Zagar
Robin Winchester
J. Daniel Albert
280 King of Prussia Rd.
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

**VERIFICATION**

I, Darold L. Harris, hereby verify that I have authorized the filing of the attached

Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to

the best of my knowledge, information and belief.   I declare under penalty of perjury that the

foregoing is true and correct.

DATE: _5 - 8 - 0 8_

_Darold L Harris_
**DAROLD L. HARRIS**

**VERIFICATION**

I, James E. Kazol, hereby verify that I have authorized the filing of the attached

Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to

the best of my knowledge, information and belief.   I declare under penalty of perjury that the

foregoing is true and correct.


DATE: _5/12/08_                          _____

                                        JAMES E. KAZOL